[No. 85729-6.    En Banc.]

Argued October 18, 2011.    Decided March 1, 2012.

*In the Matter of the Dependency of* M.S.R. ET AL.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent,*
v. NYAKAT LUAK, *Appellant.*

2

4

*Mindy M. Carr*; and *Jan Trasen* and *Marla L. Zink* (of *Washington Appellate Project*), for appellant.

*Susan E. Llorens*; and *Robert M. McKenna, Attorney General, Allyson S. Zipp, Deputy Solicitor General,* and *Peter B. Gonick, Assistant,* for respondent.

*Casey Trupin, Erin Kathleen Shea McCann,* and *Bobbe J. Bridge* on behalf of Columbia Legal Services and Center for Children & Youth Justice, amici curiae.

*Kimberly D. Ambrose* on behalf of Children and Youth Advocacy Clinic and Lisa Kelly, Director, amici curiae.

*Eric S. Merrifield* and *J. Camille Fisher* on behalf of Mockingbird Society, amicus curiae.

*Nancy Lynn Talner, Sarah A. Dunne, Melody R. Spidell,* and *Jared Van Kirk* on behalf of American Civil Liberties Union of Washington Foundation, amicus curiae.

*Brent M. Pattison, Hillary A. Behrman,* and *Nicole K. Mcgrath* on behalf of TeamChild, amicus curiae.

*Jana L. Heyd* on behalf of Society of Counsel Representing Accused Persons, amicus curiae.

*Robert D. Wyman Jr.* and *Floris J. Mikkelsen* on behalf of The Defender Association, amicus curiae.

*Kari Lee Vander Stoep* and *John S. Wilson* on behalf of KidsVoice, National Center for Youth Law, First Star, National Association of Counsel for Children, Children's Law Center of California, Children's Advocacy Institute, Juvenile Law Center, Professor Michael Dale, and Professor Theodor Liebmann, amici curiae.

*Linda Lillevik* on behalf of Washington State Psychological Association, amicus curiae.

*Travis Stearns* on behalf of Washington Defender Association, amicus curiae.

¶1 CHAMBERS, J. — After a lengthy trial, a judge found that the State had established all statutory and constitutional factors necessary for the termination of Nyakat Luak's parental rights to her twin sons. Luak argues that the trial court erred in finding two of the statutory factors: that the State expressly and understandably offered or provided to her all the necessary services to correct her parental deficiencies and that there was little likelihood those deficiencies could be remedied in the foreseeable future. We find substantial evidence supports the judge's findings.

¶2 Additionally, Luak contends the trial judge erred in not appointing counsel to represent her twin sons. Washington law authorizes, but does not require, trial judges to appoint counsel to children who are the subject of dependency and termination cases. RCW 13.34.100(6). Luak essentially contends that the statute is inadequate and constitutional due process guarantees every child in a dependency or termination case appointed counsel. We agree that children whose parents are subject to dependency and termination proceedings have vital liberty interests at stake and may constitutionally be entitled to counsel, if necessary to protect those interests. But whether any individual child is entitled to counsel must be decided case by case. We hold that RCW 13.34.100(6) is constitutionally adequate and that the deprivation, if any, of a child's right to counsel in such circumstances may be protected by appellate review. We note that neither Luak nor anyone else requested counsel for her children below and she raised her due process claim for the first time on appeal, denying the trial judge of the opportunity to timely consider the issue. She has failed to meet her burden of showing reversible error, and the termination of her parental rights is affirmed.

## FACTS

¶3 The trial court found Luak left her then four-year-old twin sons and the twins' younger sister alone in her apart-

ment while she went to work. While the children were alone in the apartment, a fire broke out.[1] After the fire was put out, police waited for two hours for a parent or caretaker to return. When none did, the children were taken into protective custody and transported to Seattle Children's Hospital to be treated for smoke inhalation. About five and a half hours after the fire, Luak contacted the police. When she was told that her children were at the hospital and that they had been found unsupervised in an apartment during a fire, she became hysterical and hung up. Luak went to the hospital and waited in the parking lot for her children to emerge. When she saw her children with a social worker, she "assaulted social worker Mary Marrs in the parking lot of Children's Hospital by punching her in the head and kicking her in the leg." Clerk's Papers (CP) at 185.

¶4 Luak's life has undoubtedly been very difficult. She is a refugee from the Sudanese civil wars and spent time in a brutal refugee camp before immigrating to the United States as a teenager. At the time of the trial, she had three children and was pregnant with a fourth. In addition to the twin boys, born in 2000, at issue in this petition, their younger sister who was in the apartment is now in the custody of her father. The father of the twin boys has apparently played no role in their lives, and his parental rights were terminated in 2008.

¶5 The twins were found dependent in 2005. In January 2006, after Luak completed parenting classes, the children were returned to her. They were removed that October after one was injured by Luak's brother, who drove drunk with the children in the car. They were returned to Luak in June 2007 and removed that October after Luak was arrested on suspicion of possession of a stolen vehicle and on an outstanding warrant for a weapons violation. They were returned again that November and removed again that December. It appears that Luak has not had custody since.

---

[1] Luak objects to the trial court's finding that she left the children alone.

¶6 While Luak clearly loves her children and no one has suggested that she has ever physically harmed them herself, Luak has a history of episodes of rage and physical attacks on those around her. Luak was directed to take parenting and anger management classes, to avail herself of family preservation services, to undergo a psychological assessment, and to follow any therapy recommendation made by the evaluator. The psychological evaluator initially recommended psychotherapy and later cognitive behavioral therapy, which Luak did not do.

¶7 In 2008, Luak assaulted a visit supervisor in front of her daughter and assaulted her boyfriend by repeatedly punching him in the head while he was holding their one-month-old son. A 2008 evaluation found that Luak's parental deficiencies had not improved and stressed the need for cognitive behavior therapy. The trial court found that "[t]he evidence presented at this trial establishes beyond doubt that the essential service for Ms. Luak is [cognitive behavior therapy and] it is clear that she has known for years that she has been ordered to do it and where to obtain it but has failed to do so." CP at 183. Aside from that, she "participated in the ordered services more than once." *Id.*

¶8 On August 8, 2008, the State petitioned to terminate the parent-child relationship. It noted that the children were in a relative placement and were doing well. A guardian ad litem (GAL) for the children was assigned a week later. It appears that the twins have been living with their uncle, Luak's brother, since 2007. A social worker testified that the uncle had an "open-door policy" where Luak was welcome to visit at any time but, as of the time of trial, had not.

¶9 Before the trial, the State filed a motion in limine to exclude MSR, TSR, and their younger sister from testifying, arguing that it was not in their best interests, that cross-examination would likely "cause the children undue discomfort," and that the experience could traumatize them.

CP at 94-95, 97. It noted that the GAL was "statutorily required to report to the court the express wishes of [the children] regarding termination of parental rights [and] if the children oppose termination . . . the court will be required to take that into consideration." CP at 97. Luak opposed the motion, arguing that the court should hear from the children before making such a monumental decision about their lives and that the trauma of testifying would be outweighed by the trauma of having the decision made without their input. In the alternative to formal testimony, she suggested the trial judge interview the children in chambers, with counsel present. During the pretrial hearing, the court appointed special advocate (CASA) for the children supported the State's motion in limine.[2] The GAL stipulated that "the boys would say that they don't want to lose their mom." 7A Verbatim Report of Proceedings (VRP) (Oct. 18, 2009) at 988. However, the GAL strongly opposed having the children testify because it could cause them "extreme anxiety," and they might "blame themselves for the rest of their lives that they caused the action that the Court had to take." *Id.* at 988-89. Judge James Doerty said, "I don't see the purpose, and there's a big downside" and granted the motion to exclude the children from testifying. *Id.* at 991. It appears from the record and briefing that Luak never suggested counsel be appointed to represent her children.

¶10 After a 13 day trial, Luak's parental rights were terminated. Judge Doerty found that Luak clearly loved her children and found "the possibility of losing them through the legal system enormously frustrating and baffling." CP at 181. He also found that her testimony was not credible

---

[2] The CASA program was established in 1977 by King County Superior Court Judge David W. Soukup. While a judge in juvenile court, Judge Soukup was struck by the fact "that there was no one in the courtroom whose only job was to provide a voice for those children." He recruited volunteers to advocate for such children. David W. Soukup, *Thanks for 30 Years of Volunteering*, THE CONNECTION: NEWS AND INFORMATION FROM THE NATIONAL COURT APPOINTED SPECIAL ADVOCATE ASSOCIATION, Spring 2007, at 4. Since that time, the program has gone nationwide and over two million children have been represented by CASA volunteers. *Id.* at 2.

and that she had "clearly" and repeatedly lied. CP at 148, 181. He found that she "has not accepted responsibility for her actions and choices or acknowledged the importance of doing so to anybody; she was unable to do so during the trial." CP at 189. Judge Doerty found the State had established the statutory factors by clear, cogent, and convincing evidence and that termination was in the children's best interests.

## ANALYSIS

### 1. STATUTORY FACTORS

¶11 Luak challenges the trial judge's conclusion on two of the statutory factors: that services were adequately offered and that there was little likelihood of remedying her parental defects in the foreseeable future. RCW 13.34.180(1)(d), (e). Parental rights can be terminated only if the trial court finds by clear, cogent, and convincing evidence that all six statutory factors have been met, among other things not raised here. RCW 13.34.180; *In re Welfare of A.B.*, 168 Wn.2d 908, 911-12, 232 P.3d 1104 (2010).[3] We will uphold the trial court's factual findings if they are supported by substantial evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999) (citing *In re Dependency of C.B.*, 61 Wn. App. 280, 286, 810 P.2d 518 (1991)). Unchallenged findings are verities on appeal. *State v. Rankin*, 151 Wn.2d 689, 709, 92 P.3d 202 (2004) (citing *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)).

### A. Services

¶12 Among other things, the State must establish "[t]hat the services ordered under RCW 13.34.136 have been ex-

---

[3] In accordance with *A.B.*, the trial court explicitly found that "Luak is unfit to parent these children." CP at 194 (Finding of Fact 1.74). Luak assigned error to this finding but devoted no specific argument to it.

pressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). Luak does not seriously contend adequate services were not offered to her. She focuses on the "understandably" requirement and argues the trial judge erred in finding that services were understandably offered to her, contending that "the social workers failed to adequately communicate . . . the importance of the recommended therapy." Br. of Appellant at 27. But the evidence supports the trial judge's detailed findings to the contrary. Luak was told repeatedly by the social workers she needed cognitive behavior therapy, she was told repeatedly that her parental rights could be terminated if she did not do it, she was repeatedly referred to providers, and she chose not to undergo it. 2 VRP (Sept. 29, 2009) at 196, 260; 3-A VRP (Oct. 7, 2009) at 415 (referencing two specific cognitive behavior therapy referrals); CP at 182-84; Ex. 56 (Oct. 31, 2008 letter stressing need for cognitive behavior therapy); Ex. 57 (Mar. 9, 2009 letter stressing need for cognitive behavior therapy "as a pre-condition of having your children returned to your care" and listing service providers, including low or no cost providers); Ex. 60 (similar letter sent Apr. 22, 2009). Judge Doerty heard the evidence from both sides and specifically concluded that necessary services had been understandably, expressly, and repeatedly offered. Substantial evidence supports his conclusion.

## B. Parental Deficiencies

¶13 Luak contends that the trial judge erred in finding that there was little likelihood her parental deficiencies could be remedied in the foreseeable future under RCW 13.34.180(1)(e). The trial judge found that Luak had a " 'psychological incapacity or mental deficiency . . . so severe and chronic as to render [her] incapable of providing proper care for the child for extended periods of time or for periods

of time that present a risk of imminent harm to the child.' " CP at 190-91 (quoting RCW 13.34.180(1)(e)(ii)). While there is certainly evidence in the record that Luak was often a loving and attentive mother, there was also substantial evidence, discussed above, that she suffered from deep deficiencies that had not improved in the five years since the case began and showed little likelihood of being remedied in the near future. The trial court did not err in finding that "[t]here is little likelihood that conditions will be remedied so that the children could be returned to their mother's care in the near future." CP at 185. The statutory factors have been met.

### 2. DUE PROCESS AND THE RIGHT TO COUNSEL

¶14 For the first time on appeal, Luak contends that her children had a constitutional right to counsel; that since no counsel had been appointed, their rights had been violated; and that thus the termination order must be vacated. Typically, we do not consider issues raised for the first time on appeal. RAP 2.5(a). However, we have the authority to do so. *See Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988) (citing *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181 (1972)). This court may consider even moot questions when "it can be said that matters of continuing and substantial public interest are involved." *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972) (citing *State ex rel. Yakima Amusement Co. v. Yakima County*, 192 Wash. 179, 73 P.2d 759 (1937), *overruled in part by Schneidmiller & Faires, Inc. v. Farr*, 56 Wn.2d 891, 355 P.2d 824 (1960)). Given the extensive briefing from both the parties and amici, we find this is an appropriate case to consider the question.[4]

¶15 Both our current statutory law and our court rules give trial judges the discretion to decide whether to

---

[4] Luak contends that she did preserve this issue by putting her children on the witness list and asking the trial judge to hear from them. We find that this is not specific enough to raise the children's constitutional right to counsel.

appoint counsel to children who are the subjects of dependency or termination proceedings. RCW 13.34.100(6)(f) ("If the child requests legal counsel and is age twelve or older, or if the guardian ad litem or the court determines that the child needs to be independently represented by counsel, the court may appoint an attorney to represent the child's position."); JuCR 9.2(c)(1).[5] In 2010, the legislature specifically required that children 12 years and older be informed of the right to request counsel and be asked every year whether they wish to exercise that right. Laws of 2010, ch. 180, § 2(6)(a), *codified as* RCW 13.34.100(6).[6] Luak, supported by many amici, essentially contends that our system

---

[5] **Dependency and Termination Proceedings.** The court shall provide a lawyer at public expense in a dependency or termination proceeding as follows:

(1) Upon request of a party or on the court's own initiative, the court shall appoint a lawyer for a juvenile who has no guardian ad litem and who is financially unable to obtain a lawyer without causing substantial hardship to himself or herself or the juvenile's family. The ability to pay part of the cost of a lawyer shall not preclude assignment. A juvenile shall not be deprived of a lawyer because a parent, guardian, or custodian refuses to pay for a lawyer for the juvenile. If the court has appointed a guardian ad litem for the juvenile, the court may, but need not, appoint a lawyer for the juvenile.

JuCR 9.2(c).

[6] (a) Pursuant to this subsection, the department or supervising agency and the child's guardian ad litem shall each notify a child of his or her right to request counsel and shall ask the child whether he or she wishes to have counsel. The department or supervising agency and the child's guardian ad litem shall notify the child and make this inquiry immediately after:

(i) The date of the child's twelfth birthday;

(ii) Assignment of a case involving a child age twelve or older; or

(iii) July 1, 2010, for a child who turned twelve years old before July 1, 2010.

(b) The department or supervising agency and the child's guardian ad litem shall repeat the notification and inquiry at least annually and upon the filing of any motion or petition affecting the child's placement, services, or familial relationships.

RCW 13.34.100(6). Additionally, the judge is to inquire whether the child wants counsel. *Id.* Since the twins turned nine during the termination trial, this amendment does not specifically apply to them. At the time of trial, the statute authorized trial judges to appoint counsel (to children of any age) but did not specifically require that the GAL or the judge inquire whether the child wanted one. Former RCW 13.34.100(6) (1993). The legislature amended the statute because it was concerned children were not being informed of their right to counsel and to stress the need for "well-trained advocates." Laws of 2010, ch. 180, § 1 (legislative findings).

is unconstitutional because it does not guarantee counsel in every case. Whether a statute is constitutional is a question of law we review de novo. *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 503, 198 P.3d 1021 (2009) (citing *State v. Jones*, 159 Wn.2d 231, 237, 149 P.3d 636 (2006)). We presume that statutes are constitutional, and the challenger bears the burden of showing otherwise. *State v. Lanciloti*, 165 Wn.2d 661, 667, 201 P.3d 323 (2009) (citing *City of Seattle v. Ludvigsen*, 162 Wn.2d 660, 668, 174 P.3d 43 (2007); *Heinsma v. City of Vancouver*, 144 Wn.2d 556, 561, 29 P.3d 709 (2001)).

¶16 This court recognized long ago that parents subject to dependency and termination proceedings have a fundamental liberty interest in the right to parent their children and a constitutional right to counsel when the State seeks to terminate that right. *In re Welfare of Myricks*, 85 Wn.2d 252, 253-54, 533 P.2d 841 (1975); *In re Welfare of Luscier*, 84 Wn.2d 135, 136-39, 524 P.2d 906 (1974). We concluded:

> The right of a natural parent to the companionship of his or her child must be included within the bundle of rights associated with marriage, establishing a home and rearing children. This right must therefore be viewed as "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105, 78 L. Ed. 674, 54 S. Ct. 330, 90 ALR 575 (1934), cited with approval in *Griswold v. Connecticut*, 381 U.S. 479, 487, 14 L. Ed. 2d 510, 85 S. Ct. 1678, (1965)[, *Snyder overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)]. In *May v. Anderson*, 345 U.S. 528, 533, 97 L. Ed. 1221, 73 S. Ct. 840 (1953), the right of a parent to a child's companionship was considered to be "far more precious . . . than property rights" and in *In re [Welfare of] Gibson*, 4 Wn. App. 372, 379, 483 P.2d 131 (1971), cited with approval in *In re Luscier, supra*, the right was characterized as even "more precious . . . than the right of life itself."

*Myricks*, 85 Wn.2d at 253-54 (second and fourth alterations in original). The legislature codified this requirement in RCW 13.34.090. Both *Myricks* and *Luscier* predated

*State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986), by more than a decade, so not surprisingly, the court did not specifically consider what process was due under the United States Constitution as opposed to the Washington Constitution.

¶17 Since that time, the United States Supreme Court has considered whether the federal constitution requires the State to provide counsel to all parents facing termination proceedings and found it did not. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 31-32, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). To analyze the question, the court deployed the three part *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), test. Under *Mathews*, the court considers "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Lassiter*, 452 U.S. at 27 (citing *Mathews*, 424 U.S. at 335). The United States Supreme Court found no blanket right to appointed counsel, but it noted that due process could demand appointment of counsel in a particular case. As the Court reasoned, "[I]n a given case [where] the parent's interests were at their strongest, and State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the [*Mathews*] factors did not overcome the presumption against the right to appointment counsel." *Id.* at 31. "But since the [*Mathews*] factors will not always be so distributed . . . neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding." *Id.* The court found that an indigent parent's federal due process right to counsel was sufficiently protected by a statute that permitted, but did not require, a trial court to appoint counsel if necessary, subject to appellate review. *Id.*[7] Despite Luak's suggestion that children's

---

[7] Congress has established a limited statutory right of representation (though not necessarily by attorney) by providing as a condition for receiving federal funds, "in every case involving an abused or neglected child which results in a judicial proceeding," each state is required to "provide a guardian ad litem . . . to

rights "fall outside *Lassiter's* framework," Suppl. Reply Br. of Luak at 2, we find the United States Supreme Court's discussion of the rights of parents facing the termination of the parent child relationship in *Lassiter* instructive in analyzing the rights of a child facing the termination of the very same relationship.

¶18 Applying the *Mathews* factors considered by the *Lassiter* court, we first address the private interests at stake. The State does not argue that the children do not have a liberty interest in termination proceedings. Instead, the State argues that the children's interests are no greater than the parents' and, thus, what is constitutionally adequate for the parents would be constitutionally adequate for the children. Courts have long recognized the cardinal right of parents to the " 'custody, care and nurture of the child.' " *Luscier*, 84 Wn.2d at 136-37 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944)). As we observed in *Luscier*, this court has been zealous in its protection of familial relationships. *Id.* at 137 (citing *In re Welfare of Hudson*, 13 Wn.2d 673, 678, 126 P.2d 765 (1942)).

¶19 Children are dependent upon others to provide for their basic needs. The importance of family and familiar relationships to a natural and healthy childhood seems well established. In a dependency or termination proceeding, the parent is at risk of losing the parent-child relationship, but the child is at risk of not only losing a parent but also relationships with sibling(s), grandparents, aunts, uncles, and other extended family. *See generally In re Custody of Shields*, 157 Wn.2d 126, 151-52, 136 P.3d 117 (2006) (Bridge,

---

represent the child." 42 U.S.C. § 5106a(b)(2)(A)(xiii); *see also* 42 U.S.C. §§ 5101-5107 (Child Abuse Prevention and Treatment and Adoption Reform Act). In 1996, Congress added the court could appoint an attorney, special advocate, or both to obtain firsthand a clear understanding of the situation and needs of the child and to make recommendations to the court concerning the best interests of the child. Randi Mandelbaum, *Revisiting the Question of Whether Young Children in Child Protection Proceedings Should Be Represented by Lawyers*, 32 Loy. U. Chi. L.J. 1, 1-3 (2000) (citing Child Abuse Prevention and Treatment and Adoption Reform Act, Amendments of 1996, Sec. 107, § 107(b)(2)(A)(xi)(I)-(II), Pub. L. No. 104-235, 110 Stat. 3063, 3073-74 (1996)).

J., concurring). The legislature has recognized the importance of these relationships in many portions of chapter 13.34 RCW.[8] *See, e.g.*, RCW 13.34.130 (directing courts to consider family placements when possible and authorizing courts to order family visitation), .385 (allowing relatives to petition for visitation). Unlike the parent, the child in a dependency or termination proceeding may well face the loss of a physical liberty interest both because the child will be physically removed from the parent's home and because if the parent-child relationship is terminated, it is the child who may become a ward of the State. It is the child, not the parent, who may face the daunting challenge of having his or her person put in the custody of the State as a foster child, powerless and voiceless, to be forced to move from one foster home to another. *See generally* Amicus Curiae Br. of Mockingbird Soc'y at 5-7 (citing *Kenny A. v. Perdue*, 356 F. Supp. 2d 1353, 1360 (N.D. Ga. 2005); Erik Pitchal, *Children's Constitutional Right to Counsel in Dependency Cases*, 15 TEMP. POL. & CIV. RTS. L. REV. 663, 667 (2006)). Foster home placement may result in multiple changes of homes, schools, and friends over which the child has no control. Amicus Columbia Legal Services informs us that 11.3 percent of children are moved three or more times in the first two years in the State's care.[9] Both this court and the Washington State Legislature have already noted that these moves themselves may cause children significant harm. *Braam v. State*, 150 Wn.2d 689, 694, 81 P.3d 851 (2003); RCW 74.13.310.

¶20 Children should be free from the risk of undue harm, especially when the State has inserted itself into the child's

---

[8] Despite this, a Braam monitoring report indicates that 35.5 percent of foster children are separated from at least one of their siblings and 18.8 percent are not placed with any of their siblings. Amici Curiae Br. of Columbia Legal Services and the Center for Children & Youth Justice at 7 (citing Braam Oversight Panel, *Braam Settlement Monitoring Report # 10* (2011), *available at* http://www.braam panel.org/MonRptMar11.pdf.

[9] Amici Curiae Br. of Columbia Legal Services and the Center for Children & Youth Justice at 9 (citing Braam Oversight Panel, *supra*, at 25-26).

life and the harm flows from that insertion. *Braam*, 150 Wn.2d at 700. However, a child, unlike a parent, who is the subject of a dependency or termination proceeding is at risk of being returned by the State to an abusive or neglectful home. While the United States Supreme Court has informed us that children have no constitutional right to State intervention to protect them from their own parents, *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989), once the State does intervene, rights attach.

¶21 While the full character of these rights has yet to be articulated, we have held foster children have a substantive due process right "to be free from unreasonable risks of harm . . . and a right to reasonable safety." *Braam*, 150 Wn.2d at 699. Foster children have the right to basic nurturing, including a safe, stable, and permanent home. RCW 13.34.020. Tragically, parents sometimes inflict upon their own children not only neglect but verbal, physical, and sexual abuses that defy detailed description here. *See, e.g.*, *State v. Lorenz*, 152 Wn.2d 22, 25, 93 P.3d 133 (2004) (parent raped and molested five year old child to produce pornography); *State v. Marshall*, 144 Wn.2d 266, 274, 27 P.3d 192 (2001) (describing father who mistreated wolf-dog hybrids and punished son by throwing him into their pen); *State v. Gaines*, 144 Wash. 446, 456-57, 258 P. 508 (1927) (evidence suggested that a father murdered his daughter when she attempted to extricate herself from an incestuous relationship with him); *see also DeShaney*, 489 U.S. at 193 (father beat his four year old son so severely as to put him in a coma and cause tremendous brain damage). Parents are sometimes subjects of dependency hearings because they have neglected, abused, or abandoned their children. Under these circumstances children whose safety and even lives may be at stake have an important interest in not being returned to the custody of those who will continue to victimize them. We conclude that for the purposes of *Mathews*, the child's liberty interest in a dependency pro-

ceeding is very different from, but at least as great as, the parent's.

¶22 Under *Mathews*, we must also consider the interest of the State. The State's interest is also very strong. In *Lassiter*, the United States Supreme Court described it as "an urgent interest in the welfare of the child." *Lassiter*, 452 U.S. at 27. No party in this case suggests otherwise, and we accept the proposition that the State has a compelling interest in both the welfare of the child and in "an accurate and just decision" in the dependency and termination proceedings. *Id.*

¶23 The third factor looks to the risk of erroneous deprivation and the value of the additional procedures sought. *Mathews*, 424 U.S. at 335; *Bellevue Sch. Dist. v. E.S.*, 171 Wn.2d 695, 704-05, 257 P.3d 570 (2011). In *Lassiter*, the United States Supreme Court essentially said, "It depends." *Lassiter*, 452 U.S. at 30. It depends on the legal and factual complexity of the situation and on the parties' ability to present their cases. *Id.*; *see also E.S.*, 171 Wn.2d at 709-10 (concluding there was little risk of an erroneous deprivation of a child's rights by absence of counsel at an initial truancy hearing). By extension, whether there is a constitutionally significant risk of an erroneous deprivation of rights may also turn on whether there is someone in the case who is able to represent the child's interests or whose interests align with the child's.

¶24 The State questions the extent to which appointing counsel to children would reduce the likelihood of erroneous proceedings or results. *See Lassiter*, 452 U.S. at 27 (citing *Mathews*, 424 U.S. at 335). As the State points out, the existing statutory scheme for termination proceedings provides counsel for the parents and a full evidentiary trial before a superior court judge with discovery, motions practice, heightened burden of proof, and appellate review. RCW 13.34.090, .092, .100, .110. The trial judge is authorized to appoint counsel for any child. RCW 13.34.100(6); JuCR 9.2(c)(1). As of last year, children 12 years old and older must be informed of the right to request counsel and be

asked every year whether they wish to exercise that right. LAWS OF 2010, ch. 180, § 2(6)(a), *codified as* RCW 13.34.100(6). These procedures are significant, and whether an additional lawyer in the proceedings would reduce the likelihood of an erroneous decision is subject to debate and has not been established here.

¶25 Luak and amici argue that the GAL and CASA volunteers inadequately protect the children's interests because among other things, they have an obligation to represent the best interests of a child, rather than the child's expressed desires. *See, e.g.*, Amici Curiae Br. of Columbia Legal Services and the Center for Children & Youth Justice at 16-17. They argue that the child should have a voice and often, as here, are not permitted to have input into the proceedings because of a perhaps misguided view that participation will be harmful to them.[10] As amicus Columbia Legal Services notes, unlike a GAL, an attorney can maintain confidential communications with the child so the child is free to disclose the child's deepest secrets and concerns and ensure that children know with whom and in what manner they can communicate. Amici also suggest that an attorney can ensure that the child's records are kept confidential and that the record on appeal does not include information that would clearly identify the child. Amici Curiae Br. of Columbia Legal Services and the Center for Children & Youth Justice at 12-13. Certainly, there are many circumstances when counsel for a child would be extremely valuable.

¶26 The State contends that children are adequately protected by the existing statutory scheme. In addition to all of the other protections, a GAL must be appointed unless "for good cause" shown the judge concludes it is not neces-

---

[10] Amici reflect the debate among scholars about the role an attorney should play in dependency and termination proceedings. Some strongly believe that counsel should advocate for the wishes of the child just as counsel would do for an adult. Others contend that the ethical obligations of a lawyer should dictate that the lawyer protect the child from harm even if the child wishes to be returned to an abusive parent. *See generally* Mandelbaum, *supra*, at 1, 30-31, 49.

sary. RCW 13.34.100(1). In many or most cases, the State contends, the GAL will represent the child's interests. Among other things, the GAL is required to advocate for the child's interests and is required to inform the court of any "views or positions expressed by the child on issues pending before the court" and to "represent and be an advocate for the best interests of the child." RCW 13.34.105(1)(b), (f). Luak and her supporting amici protest that this is inadequate because the GAL advocates for the GAL's perception of what is in the best interests of the child without regard to the child's wishes.

¶27 Applying the *Mathews* factors as the United States Supreme Court did in *Lassiter*, we conclude that under the Fourteenth Amendment to the United States Constitution, children have fundamental liberty interests at stake in termination of parental rights proceedings. These include a child's interest in being free from unreasonable risks of harm and a right to reasonable safety; in maintaining the integrity of the family relationships, including the child's parents, siblings, and other familiar relationships; and in not being returned to (or placed into) an abusive environment over which they have little voice or control. The State's interests are similar. Balancing the three *Mathews* factors together, we hold that children have at least the same due process right to counsel as do indigent parents subject to dependency proceedings as recognized by the United States Supreme Court in *Lassiter*. *See Lassiter*, 452 U.S. at 31. The Washington State Constitution, of course, would not provide less due process protection.[11]

¶28 Judges are forced to make incredibly difficult and important determinations. The judge must rely upon the

---

[11] While Luak makes this claim under both the Fourteenth Amendment and article I, section 3 of the Washington Constitution, Luak did not provide a *Gunwall*, 106 Wn.2d 54, analysis until her supplemental brief to this court. Consequently, this case does not provide us with a vehicle to consider the entire scope of the article I, section 3 right in this context. *See State v. Wethered*, 110 Wn.2d 466, 472, 755 P.2d 797 (1988) (citing *In re Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986)).

information provided by others. GALs and volunteer CASAs are invaluable to courts. They are often the eyes and ears of the court and provide critical information about the child and the child's circumstances. We recognize that GALs and CASAs are not trained to, nor is it their role to, protect the legal rights of the child. Unlike GALs or CASAs, lawyers maintain confidential communications, which are privileged in court, may provide legal advice on potentially complex and vital issues to the child, and are bound by ethical duties. Lawyers can assist the child and the court by explaining to the child the proceedings and the child's rights. Lawyers can facilitate and expedite the resolution of disputes, minimize contentiousness, and effectuate court orders. Randi Mandelbaum, *Revisiting the Question of Whether Young Children in Child Protection Proceedings Should Be Represented by Lawyers*, 32 Loy. U. Chi. L.J. 1, 61-62 (2000).[12] We recognize the different, important, and valuable roles of GALs, CASAs, and counsel to children in dependency and parental termination proceedings.

¶29 The question remains whether RCW 13.34.100(6) is constitutionally adequate to protect these children's liberty interests. Under *Lassiter*, the *Mathews* factors may be applied by the trial court case by case in order to determine if due process is satisfied in any given case. The constitutional due process right to counsel is also protected by case by case appellate review. Indeed, each child's circumstances will be different. An infant who cannot yet form, articulate, or otherwise express a position on any relevant issue will not benefit as much from the attorney/client privilege or from counsel's advocacy for the right to be heard at hearing as would a 10, 12, or 14 year old; there are, of course, many circumstances in between. Surely, under appropriate cir-

---

[12] We note that amici argue that sometimes the GALs are opposed to asserting the legal rights of a child and oppose appointment of counsel because counsel may advocate for a viewpoint other than the GAL's view of what is in the best interest of the child. *See, e.g.*, Amici Curiae Br. of Columbia Legal Services and the Center for Children & Youth Justice at 17 n.22. This is certainly something a trial judge may take into consideration when deciding whether to appoint counsel.

cumstances, an infant would be entitled to counsel, but we use the infant as an example to illustrate that the *Mathews* factors may weigh differently when applied to different children. Under RCW 13.34.100(6), the trial judge is permitted but not required to consider the issue of appointment of counsel. When the issue is properly raised under the statute, the trial judge, subject to review, should apply the *Mathews* factors to each child's individual and likely unique circumstances to determine if the statute and due process requires the appointment of counsel.

¶30 We hold the due process right of children who are subjects of dependency or termination proceedings to counsel is not universal. The constitutional protections, RCW 13.34.100(6), and our court rules give trial judges the discretion to decide whether to appoint counsel to children who are subjects of dependency or termination proceedings.[13] The twins in question were not 12 years of age at the time of the proceedings. No one, including Luak, asked the judge to make a determination whether the appointment of counsel was appropriate. The court could have on its own motion appointed counsel for the children, but Luak fails to provide any evidence in the record that would have compelled the court to do so. We hold she has not met her burden to show that the trial court erred in not appointing counsel for her children.

## CONCLUSION

¶31 We hold that substantial evidence supports the trial court's finding that the State proved every element by clear, cogent, and convincing evidence required to terminate Luak's parental rights. We further hold that children of parents subject to dependency and termination proceedings have due process rights that must be protected and, in some

---

[13] We recognize that this is an appeal of a termination order. Nothing in this opinion should be read to foreclose argument that a different analysis would be appropriate during the dependency stages.

cases, must be protected by appointment of counsel, but that the right to appointment of counsel is not universal. We further hold that RCW 13.34.100(6) is constitutionally adequate to protect the right of counsel for such children. Luak has failed to meet her burden to show the court erred in failing to appoint counsel for her twin boys. We affirm.

MADSEN, C.J.; C. JOHNSON, OWENS, FAIRHURST, J.M. JOHNSON, STEPHENS, and WIGGINS, JJ.; and ALEXANDER, J. PRO TEM., concur.

After modification, further reconsideration denied May 9, 2012.