IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Guardianship of:<br><br>G.M.O.,<br><br>          a Minor Child. | No. 83506-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

      HAZELRIGG, J. — Mr. O appeals an order granting a guardianship over his son, G.M.O. He argues that the Department of Children, Youth, and Families did not provide all necessary services and that G should have been appointed independent counsel rather than a Guardian Ad Litem. Based on Washington case law and the plain language of chapter 13.34 RCW, we affirm.

FACTS

In June 2019, the Department of Children, Youth, and Families (Department) filed a dependency petition over G.M.O.[1] G was found dependent two months later and placed with his maternal great uncle. The court identified Mr. O's parental deficiencies as substance abuse, lack of safe and stable housing, insufficient parenting skills, and domestic violence concerns. He was ordered to complete a domestic violence (DV) assessment and follow any treatment recommendations, take parenting classes, complete a drug and alcohol evaluation and comply with recommended treatment, and participate in random urinalysis (UA) testing. Throughout the dependency, Mr. O struggled to access and maintain housing, primarily living in his car. The court found Mr. O was not in compliance with its orders and had not made "[p]rogress toward correcting the problems that necessitated the child's placement in out-of-home care" at all but one of the dependency review and permanency planning hearings. At the May 2021 dependency review hearing, the court found Mr. O was in partial compliance with the court's orders because he "completed inpatient treatment in March, but has not participated in outpatient treatment after completing inpatient treatment or engaged in his other services." Mr. O worked with numerous Department staff members during the dependency. Department case worker Victoria Metcalf was assigned to Mr. O from June 2019 until September 2020. Liz Zambrano was assigned to Mr. O from September 2020 until March 2021, but she was subsequently removed from all her assigned cases and did not testify at trial.

---

[1] G's mother agreed to the entry of the guardianship order and is not a party to this appeal.

- 2 -

Department case worker Renee Boyd was assigned to Mr. O from March 25, 2021 through the guardianship trial. Ann Brice served as Court Appointed Special Advocate/Guardian ad Litem (GAL) for G throughout the dependency and appeared at trial.

In July 2021, the fact-finding trial on the Department's petition for guardianship began. Due to continuances, the trial did not resume until September, and then again in October. On November 10, 2021, the court granted the petition for a guardianship and issued findings and conclusions. The court found that the Department had referred Mr. O to a domestic violence assessment three times, but it was never completed. Mr. O did complete two Domestic Violence — Moral Reconation Therapy classes, but the court found this was not sufficient to constitute any progress. The court also found Mr. O did not engage in any parenting courses the Department offered. Mr. O did complete several substance use evaluations. He completed inpatient substance abuse treatment in March 2021 with a discharge recommendation to transition to intensive outpatient treatment. However, the court found Mr. O did not complete intensive outpatient treatment and, by the time of trial, had "completely stopped all of his substance abuse treatment services." Mr. O was also ordered to participate in UA testing, but he failed to attend any UA offered by the Department. He "was not able to provide a sober date," and had "admitted to using methamphetamine two to three weeks prior to the start of trial." Finally, the court found there was "little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." Based on these findings, the court concluded that a guardianship

would provide G "with stability and permanency," and that each element of RCW 13.36.040(2)(c) had been met. It ordered a guardianship and dismissed the dependency. Mr. O timely appeals.

ANALYSIS

A guardianship provides a path to permanency for a dependent child, and is an alternative to termination of parental rights. In re Guardianship of D.S., 178 Wn. App. 681, 687, 317 P.3d 489 (2013). While "[a] guardian maintains physical and legal custody of a child," "[t]he parent retains a right of contact with the child as determined by the court." Id. at 688. Once the guardianship is ordered, the dependency is dismissed. Id. at 687.

A court may establish a guardianship over a dependent child if six elements are met: (1) the child is dependent under RCW 13.34.030, (2) a dispositional order is entered, (3) the child has been out of the parent's custody for at least six months, (4) all services are ordered under a dispositional order or permanency plan and all necessary services have been offered or provided, (5) "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future," and (6) a proposed guardian has signed a statement accepting rights and responsibilities. RCW 13.36.040(c). Unlike a proceeding for termination of parental rights, the court need only find each element "by a preponderance of the evidence." RCW 13.36.040(2)(a).

I.    All Necessary Services

      A.    Housing Assistance

Mr. O contends that the Department failed to offer housing assistance and therefore finding of fact 2.8.9(iv), that all necessary services were provided, is not supported by substantial evidence.

Under RCW 13.36.040(c)(iv), the Department must demonstrate that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided." See also In re Parental Rights to I.M.-M., 196 Wn. App. 914, 921, 385 P.3d 268 (2016). This court reviews factual findings for substantial evidence, which "exists so long as a rational trier of fact could find the necessary facts were shown by a preponderance of the evidence." In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Unchallenged findings are verities on appeal. Id.

The Department argues "the dependency court never found Mr. O's homelessness or lack of suitable housing to be a significant factor preventing G.M.O.'s return to Mr. O" and thus housing was not a necessary service. This argument is not well taken. The court below explicitly found "the father's parental deficiencies are the following: substance abuse, parenting, domestic violence, and lack of safe and stable housing." (Emphasis added.) In the case In re Dependency of G.L.L., this court stated in a published opinion, that, where the "[l]ack of safe and stable housing was explicitly identified as a parenting deficiency," and thus "certainly could have precluded reunification," housing was "a necessary service." 20 Wn. App. 2d 425, 433, 499 P.3d 984 (2021). As such, even though Mr. O's

lack of housing was not a "significant factor that delayed permanency," and "the dependency court never ordered DCYF to provide housing assistance," because it was identified as a parenting deficiency, it could have precluded reunification and was therefore a necessary service.

When a service is necessary, "At a minimum, [the Department] must provide a parent with a list of referral agencies that provide" the service. In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). However, "the court may consider any service received, from whatever source, bearing on the potential correction of parental deficiencies." Id. at 651-52. Here, Department case worker Metcalf testified that she "offered opportunities for safe and stable housing through sobriety housing," and she "encouraged Mr. [O] to contact housing navigation, 211, as well as reach out to Homeward House, which was a nonprofit that helped facilitate parents to resources such as housing opportunities." On cross-examination by Mr. O, Metcalf agreed "it would be fair to say that in effect [she] told Mr. [O] about housing programs that he would need to then undertake on his own."

Lisa Willms, one of Mr. O's substance use treatment providers, testified that Mr. O "secured housing through the Office of Neighborhoods" after being discharged from inpatient treatment. Department case worker Boyd testified that, to her knowledge, the Department never "provided Mr. [O] with any list of housing resources." She also testified she only "briefly . . . discussed housing with" Mr. O, and that, "There was no mention of him needing assistance in getting housing at that time" because, "He didn't request any assistance," despite her knowledge that

Mr. O was "living in his car or that he was couch-surfing." Boyd did "mention[] . . . the men's shelter" to Mr. O. Metcalf testified that she made two referrals and offered "sobriety housing," though how or when she did so is unclear from the record. While the Department characterizes this as Metcalf "provid[ing] Mr. O with a list of housing resources on multiple occasions," there is no testimony to support such a finding. Metcalf never testified she made referrals on multiple occasions, she never testified when she made referrals, and she never testified to providing a list of resources. Boyd testified only that she "mentioned . . . the men's shelter" to Mr. O.

There is no documentation in the record confirming Metcalf's or Boyd's purported mentions of housing resources. Metcalf testified she would "provide [information about services] to him verbally, over text messages, as well as in person with service letters." She did not clarify how she communicated information about housing resources. Boyd did not explain how she "mentioned the men's shelter" to Mr. O. The Department submitted two service letters by Metcalf; neither mentioned housing. The parties agree that Metcalf did inform Mr. O about 211 and Homeward House and we accept their agreement. Rather, Mr. O contends these efforts were insufficient and that the Department must provide an actual list of referrals, rather than "merely discuss[ing]" resources.

However, this court may "consider any service received, from whatever source, bearing on the potential correction of parental deficiencies," though "the responsibility for offering or providing services belongs to the Department, and the Department cannot just point to the efforts of others if its own efforts might have

succeeded where others did not." D.A., 124 Wn. App. at 651-52, 656. Here, Willms testified that Mr. O "secured housing through the Office of Neighborhoods" after being discharged from inpatient treatment. Mr. O testified he "contacted and signed up with the HEN program, 211, the housing that's through 211, Homeward House." He also worked with a program offered by the Snohomish County Sheriff's Department and was assigned a caseworker to assist with housing. Brice also discussed Homeward House with Mr. O, though it was unclear if this was before or after Metcalf mentioned the program to Mr. O. Through the Homeward House program, Mr. O was assigned a case manager who assisted him with applying for a housing voucher. By the end of trial, Mr. O was in the process of receiving a housing voucher and his Homeward House case worker expected he would have housing between 90 days and about 6 months from trial. While Mr. O's argument is both logical and compelling, it is one perhaps best directed at the legislature.

Under controlling case law, the Department met its statutory burden to provide housing assistance, though only because Mr. O received services from other sources.

### B. Whether Services Would Cure Deficiencies

"Even in instances where the Department inexcusably fails to offer all necessary services, termination may still be appropriate if the service would not remedy the parent's deficiencies within the foreseeable future." In re Parental Rights to K.M.M., 186 Wn.2d 466, 486, 379 P.3d 75 (2016). The foreseeable future is based on the age of the child. In re Welfare of M.R.H., 146 Wn. App. 10, 25, 188 P.3d 510 (2008). "Because of the highly fact-specific nature of termination

proceedings, deference to the trial court is 'particularly important.'" K.M.M., 186 Wn.2d at 477 (quoting In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)).

Here, Mr. O's identified parental deficiencies were "substance abuse, parenting, domestic violence, and lack of safe and stable housing." He had found housing services and secured a housing voucher by the end of the guardianship trial. While the court noted Mr. O had made steps in housing, it stated, "Mr. [O]'s housing situation is not at the point the court would want to see for it to be considered a showing of progress on this case." The court found that the "near future for [G] is six months or less." More critically, the court found Mr. O did not make "sufficient progress" in addressing any of his parental deficiencies, he "ha[d] not fully engaged in his substance abuse treatment services and [wa]s not currently engaged in any substance abuse treatment service," had not provided UAs, had not participated in parenting classes, and did not complete a DV assessment after being referred to one by the Department. The court also found, "There is little likelihood that the conditions will change in the near future." Mr. O did not assign error to this finding. "Unchallenged findings of fact are verities on appeal." A.W., 182 Wn.2d at 711. Even if the Department had provided Mr. O with housing services, the court concluded that none of his other parental deficiencies were sufficiently progressing by the end of trial. Because the unchallenged findings that Mr. O had not fully engaged in services to address his identified deficiencies, and that there was little likelihood conditions would change

in the near future are verities, the guardianship order was proper on these other bases.[2]

II.    Appointment of Counsel for G

Mr. O next contends the guardianship proceeding did not comport with procedural due process because the court failed to appoint an attorney for G.  A child may be appointed an attorney in a dependency proceeding on the court's "own initiative, or upon the request of a parent, the child, a guardian ad litem, a caregiver, or the department."  RCW 13.34.212(2)(a).  If the child is 12 years or older, "The department and the child's guardian ad litem shall each notify a child of the child's right to request an attorney and shall ask the child whether the child wishes to have an attorney."  RCW 13.34.212(2)(c).  "Washington is one of only 18 states that does not provide children a categorical right to court-appointed counsel in dependency proceedings," instead "juvenile courts have discretion to appoint independent counsel."  In re Dependency of Lee, 200 Wn. App. 414, 449, 404 P.3d 575 (2017).

To determine whether the government has comported with procedural due process in a decision that impacts "an individual's liberty or property interests," this court applies the Mathews[3] test.  A.W., 182 Wn.2d at 701.  "[F]or the purposes of Mathews, the child's liberty interest in a dependency proceeding is very different

---

[2] At oral argument, Mr. O argued that the Department failed to tailor services to his particular needs, namely his previous evictions and criminal record.  Unless a party makes a motion requesting otherwise, this "court will decide a case only on the basis of issues set forth by the parties in their briefs."  RAP 12.1.  As this argument was not raised in briefing, we do not reach it.

[3] Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

from, but at least as great as, the parent's." In re Dependency of M.S.R., 174 Wn.2d 1, 17-18, 271 P.3d 234 (2012).

### A.    Risk of Cultural Bias

Mr. O first argues appointing a GAL, rather than an attorney, is insufficient to protect a child's constitutional interests because the GAL advocates for the best interests of the child, rather than the child's wishes.  GALR 2(a) explicitly states, "Representation of best interests may be inconsistent with the wishes of the person whose interest the guardian ad litem represents."  This is problematic, Mr. O contends, because the best interests assessment is based on the personal experiences of the GAL, and "is susceptible to class- and race-based biases." In re Dependency of K.W., 199 Wn.2d 131, 155, 504 P.3d 207 (2022) ("the 'best interests of the child' standard is susceptible to class- and race-based biases"). Mr. O notes that he and G are of Puerto Rican descent, and Mr. O is indigent, while "GAL volunteers are predominantly white, middle-class women."[4]  As our state Supreme Court's opinion in K.W. notes:

> We know that like all human beings, judges and social workers hold biases, and we know that families of Color are disproportionately impacted by child welfare proceedings. Therefore, actors in child welfare proceedings must be vigilant in preventing bias from interfering in their decision-making.

199 Wn.2d at 156.  The Supreme Court also noted the history of disparate separation in child welfare proceedings and continued racial disproportionality.  Id. "For example, in King County, the Black population is approximately 14 percent of

---

[4] Appellant's Br. at 37 (citing Amy Mulzer & Tara Urs, However Kindly Intentioned: Structural Racism and Volunteer CASA Programs, 20 CUNY L. REV. 23, 24 (2016)).

the overall population but made up 36 percent of the dependency caseload in 2020." Id. (citing WASH. STATE CTR. FOR COURT RESEARCH, DEPENDENT CHILDREN IN WASHINGTON STATE: CASE TIMELINESS AND OUTCOMES 2020 ANNUAL REPORT 21 (2020), apps. B, C-71). All actors in a child welfare proceeding, including GALs as officers of the court,[5] hold biases which may interfere with their decisions, and each must be vigilant to ensure these biases do not impact the manner by which they carry out their duties.

Mr. O notes that he had to correct the Department's incorrect pronunciation of G's name at trial. He further states Brice used an "anglicized[6] version of G's name" in her report. Names not only create a sense of identity and self, but "frequently carry cultural and family significance," connecting "children to their ancestors, country of origin or ethnic group." Rita Kohli & Daniel G. Solórzano, Teachers, please learn our names!: racial microaggressions and the K-12 classroom, 15:4 RACE ETHNICITY AND EDUCATION 441, 444 (2012). The State goes to great lengths in its briefing to defend the training and experience of G's appointed GAL, noting her "vigilance" in both her investigation and advocating against the termination of Mr. O's parental rights. While both of those assertions may be true, the fact remains that the child's name was anglicized in the official report submitted to the court.

---

[5] GALR 4 ("As an officer of the court, a guardian ad litem . . . ").

[6] "Anglicize" is "to make English in quality or characteristics : cause to become adapted in customs, manners, speech, or outlook to the culture of English-speaking world and often esp. to the culture distinctive of England" or "to change to an English equivalent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 83 (2002).

Regardless of intentions, the practice of anglicizing names is a form of cultural erasure with deep roots in our nation's history of colonization and forced assimilation of communities of color. It has no place within our modern legal system.

> Naming issues have a long history in North America, dating to at least colonial times. Enslaved Africans routinely were renamed by those who bought them, while Native American names quickly came to be shortened, mispronounced or translated into English or French. With the dominance of Anglo-Saxon culture well established from the beginning of the republic, European immigrants from other traditions had similar experiences of renaming, particularly if they hailed from Southern or Eastern Europe. What all of the victims of these practices had in common was their relative powerlessness, on the one hand, and the desire of those representing the dominant culture to force them to conform, on the other.

Yvonne M. Cherena Pacheco, Latino Surnames: Formal and Informal Forces in the United States Affecting the Retention and Use of the Maternal Surname, 18 T. MARSHALL L. REV. 1, 3 (1992); see also Liliana Elliott, Names Tell a Story: The Alteration of Student Names at Carlisle Indian Industrial School, 1879-1890 at 53-74 (April 3, 2019) (unpublished B.A. thesis, University of Colorado, Boulder) (on file with the University of Colorado library system) (discussing the forced alteration of Indigenous names at Carlisle Indian Industrial School, "The federal government's deliberate, purposeful eradication of Indigenous names was one tactic in a broader strategy of cultural genocide in the industrial-school era"); see also George A. Martínez, Latinos, Assimilation and the Law: A Philosophical Perspective, 20 CHICANO-LATINO L. REV. 1, 11-13 (1999) (discussing the expectation that immigrant groups "assimilate into the dominant Anglo-Saxon culture" and the devaluation of Latino culture through programs such as the official

Americanization programs). Vigilance by a GAL with "extensive training" and experience could reasonably be expected to result in recognition of such history and active avoidance of its perpetuation. Even where clear information exists in the record as to a preferred nickname of the child, best practices may be to use the proper legal name in reports, given the gravity of the proceedings.

The risk for cultural bias in child welfare matters is a severe one, and trial courts and attorneys should endeavor to educate themselves to better identify and directly address it within such proceedings. However, we are confined by appellate standards of review in our consideration of such a challenge, and while Mr. O properly identifies these issues in briefing and provides secondary sources in support, he fails to tie the Department's mispronunciation and Brice's written anglicization of G's name to a specific error or alleged bias that affected the outcome of the guardianship proceedings. Without more, his claim fails.

B.     Mathews Analysis

Mr. O next argues the Mathews factors weigh in favor of appointing counsel for G. Counsel is not required for every child in a dependency proceeding, instead "'courts are to apply the Mathews factors on a case-by-case basis.'" In re Dependency of A.E.T.H., 9 Wn. App. 2d 502, 526, 446 P.3d 667 (2019) (quoting In re Dependency of E.H., 191 Wn.2d 872, 894, 427 P.3d 587 (2018)). The factors to be considered under Mathews are: (1) the private interest implicated, (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the potential value of other additional safeguards, and (3) the government's

interest. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). In dependency proceedings, courts should also consider:

> the age of the child, whether the child is in legal or physical custody of the State, whether the child's stated interests are aligned with the GAL's assessment of the child's best interests . . . or with another represented party's desires, whether the child disputes the facts . . . whether the child presents a complex argument against the State's proposed action . . . and the issues . . . are actually disputed.

E.H., 191 Wn.2d at 894.

First, our state Supreme Court has noted "the potential impact on a parent's right to the care and custody of [their] child is significantly less in a guardianship proceeding than in a termination proceeding," because the "guardianship is not permanent and does not completely sever the parent's rights." A.W., 182 Wn.2d at 704, 702 (holding Mathews factors do not require a higher burden of proof than preponderance of the evidence). A parent can move for modification or termination of the guardianship and can move for visitation (or modification of visitation). Id. at 705. While G has a private interest in remaining with his father, he also has an interest in "a safe, stable, and permanent home and a speedy resolution of any proceeding." RCW 13.34.020. Because of the nature of guardianships, this factor weighs against appointing counsel for G.

Second, the risk of error created by the State's chosen procedure is not high. Again, guardianships may be modified or terminated by petition. A.W., 182 Wn.2d at 705. Additionally, Mr. O's case was not particularly complex, legally or factually. The Department focused on Mr. O's failure to remedy his parental deficiencies and engage in services, while Mr. O highlighted the difficulty he had engaging in services due to his homelessness and the progress he was able to

make during the dependency. G did have an opportunity to voice his wishes as the GAL's report explicitly notes, "[G] would love nothing more than to return to his parents' care." In M.S.R., our state Supreme Court previously rejected the argument that children were not adequately protected because a GAL does not have an obligation to advocate for a child's "expressed desires," or to protect a child's legal rights. 174 Wn.2d at 19, 21.

Mr. O also argues G was entitled to an attorney who would advocate for reunification throughout the dependency (for example, by advocating for more visitation[7]) and during trial, citing Brice's cross examination questions "emphasiz[ing] Mr. O's lack of engagement." However, G's desire to reunify with his father was shared by Mr. O, who was represented by counsel and conveyed that common goal to the court. For example, during closing argument, Mr. O emphasized Brice's testimony that G wanted reunification. Mr. O does not argue that G's age (ten years old), or any other characteristic, prevented him from being able to communicate his wishes. However, the court in M.S.R. noted that older children, such as those aged "10, 12, or 14" would benefit more from counsel compared to infants who are unable to "express a position." 174 Wn.2d at 21. Finally, similar to the M.S.R. case, there was never a motion made to appoint counsel, and Mr. O must demonstrate "evidence in the record that would have

---

[7] We decline to consider Mr. O's argument concerning visitation during the course of the dependency, as he appeals only the guardianship order. The Department correctly notes that Mr. O never sought unsupervised visitation, never moved to compel visitation, and agreed to the order requiring monitored visitation. We consider the visitation argument only in the context of the Mathews analysis to exemplify how an attorney for the child would advocate for the child's wishes throughout the dependency proceeding, in contrast to a GAL, who reports the child's wishes in their investigation report and at trial, but may ultimately recommend something to the court that differs from the child's preference.

compelled the court to" appoint counsel "on its own motion." See 174 Wn.2d at 22. While G's age weighs in favor of counsel, because the legal and factual issues were straightforward, and G's wishes were presented to the court both in Brice's report and by Mr. O's counsel, the risk of erroneous deprivation here is relatively low.

Concluding the Mathews analysis, this court considers the third factor, the State's interest, which is "a compelling interest in both the welfare of the child and in '"an accurate and just decision"' in the dependency and termination proceedings." M.S.R., 174 Wn.2d at 18 (quoting Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)). This factor does not weigh in favor of or against appointing counsel for G. Based on the Mathews factors, and Washington case law applying them to dependencies and guardianships, there was no procedural due process violation when the court did not sua sponte appoint counsel for G.

III.     Role of Guardian ad Litem

Finally, Mr. O argues allowing a GAL to serve as a witness and legal advocate conflicts with GAL statutes, the Rules of Professional Conduct (RPCs), and the appearance of fairness. Under RCW 13.34.100(1), a "court shall appoint a guardian ad litem for a child who is the subject of an action under this chapter." A GAL is "a person, appointed by the court to represent the best interests of a child." RCW 13.34.030(12). The duties of a GAL are statutory, including to: (1) investigate and report factual information to the court, (2) meet with the child and report the child's positions or wishes (if any), (3) monitor court orders, (4) report

any information regarding tribal membership, (5) make recommendations "regarding the best interests of the child," (6) "represent" and "advocate for the best interests of the child," (7) inform a child 12 or older about their right to counsel, and (8) understand and advocate for the best interests of an "Indian child." RCW 13.34.105(1). The GAL also has "the right to present evidence, examine and cross-examine witnesses, and to be present at all hearings" either "through an attorney, or as otherwise authorized by the court." RCW 13.34.100(5). Mr. O argues this language creates "a separation between advocating as a witness and legal advocacy in the courtroom." However, this interpretation conflicts with the plain language of the statute, which expressly permits the court to authorize a GAL to both investigate and present evidence. It is also inconsistent with RCW 13.34.105(1)(f), which imposes a duty on the GAL to advocate for the child's best interests.

Mr. O cites to In re Dependency of S.K-P., where Division Two of this court analyzed the role of a GAL, compared to an attorney for a child, stating "it is not a GAL's role to summarize or paraphrase pleadings and court orders, explain the legal implications of these documents, or give legal advice, because a GAL does not represent the child as an attorney represents a client." 200 Wn. App. 86, 110, 401 P.3d 442 (2017) (emphasis added), aff'd sub. nom. In re Dep. of E.H., 191 Wn.2d 872 (2018). This language does not prohibit a GAL from performing any duties that an attorney might perform, it simply clarifies that the role of a GAL is not the same as an attorney representing a client, and notes limitations on the

GAL's duties. Mr. O does not argue that Brice performed any of these prohibited duties. As such, Brice's actions were not inconsistent with GAL statutes.

Mr. O next argues Brice's alleged role as advocate and witness violates RPC 3.7(a), which prohibits a lawyer from acting as both an advocate and a necessary witness. While Brice is a licensed attorney, her role here was distinct as a GAL. Our court addressed this issue in a 2017 unpublished opinion and we adopt the reasoning here.[8] In the case In re Dependency of D.A.S., this court rejected the argument on two bases, first, that the parent "did not seek to discharge or disqualify the GAL," and second, because "GAL representation is distinct from legal representation."[9] The RPCs "make clear that the rules of professional responsibility apply to lawyers providing legal representation to clients." Id. (emphasis added). Similarly, Mr. O did not move to disqualify or limit Brice's participation as GAL based on RPC 3.7. Because Brice's role in this proceeding was as a GAL rather than an advocate representing a client, RPC 3.7 does not mandate her disqualification.

Mr. O further asserts that "the blurring of these lines" between witness and advocate "would cause 'a reasonably prudent, disinterested observer' to question whether Mr. O. 'received a fair, impartial, and neutral hearing.'" A judicial proceeding is only "'valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing.'" A.E.T.H., 9 Wn. App. 2d at 517 (quoting State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d

---

[8] Unpublished opinions from this court are not binding, but we adopt the reasoning herein as it has persuasive value. GR 14.1.

[9] In re Dependency of D.A.S, No. 75065-8-I, slip op. at 7 (Wash. Ct. App. April 17, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/750658.pdf.

703 (2017)). "'The party asserting a violation of the appearance of fairness must show a judge's actual or potential bias.'" Id. (quoting Solis-Diaz, 187 Wn.2d at 540). For example, in A.E.T.H., the proceeding "was biased because of the involvement of superior court employees working against the parents in this case," as the attorney GAL was instructed by the Head Superior Court Administrator to make blanket objections to every discovery request, "refuse to produce any discovery ever," and "avoid the requirement to provide free discovery to indigent parents." 9 Wn. App. 2d at 517-18. Here, Mr. O argues Brice's status as an attorney allowed her to play an outsized role at the guardianship trial, purportedly aligning herself with the Department. For example, Brice was able to cross-examine witnesses, object to hearsay testimony, and argue for the inclusion of out-of-court statements from her report under the hearsay exception. However, Mr. O fails to cite to anything in the record demonstrating that his proceeding was not fair, impartial, or neutral. He does not argue the judge displayed actual or potential bias, or that Brice's roles presenting evidence and as a witness caused bias that would not have been present had Brice only served as a fact witness. Under RCW 13.34.100, Brice was permitted to present evidence and cross-examine witnesses. Brice was also permitted to advocate for G's best interests, even if that interest aligned with the Department's position. See RCW 13.34.105(1)(f); see also GALR 2(a) (best interests of the child may not always align with the child's expressed wishes).

As our state case law has held, the duties of a GAL are distinct from those of an attorney representing a client, even where the GAL is an attorney, and

therefore RPC 3.7 is not implicated. A plain reading of the GAL statutes supports Brice's role in submitting a factual report and recommendation to the court, as well as presenting evidence and examining witnesses. Without more, Mr. O has failed to demonstrate that the guardianship proceeding was not fair, impartial, or neutral.

Affirmed.

WE CONCUR:

_____
Birk, J.

_____
Chung, J.