# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of F.Y.O. (dob: 03/02/2015), | DIVISION ONE |
| Minor Child, | No. 79941-0-I |
| STATE OF WASHINGTON, | |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| MICHAEL WILLIAM FOSTER JR., | |
| Appellant. | FILED: March 2, 2020 |

DWYER, J. — Following a four-year dependency and a five-day trial, the court terminated Michael Foster's parental rights to his child. On appeal, Foster contends the Department of Children, Youth, and Families (Department)[1] failed to carry its burden to prove several statutory prerequisites to termination. He also contends the Department failed to meet its additional burden under the federal and state Indian Child Welfare Acts, ICWA[2] and WICWA.[3] However, because unchallenged findings and substantial evidence support termination, we affirm.

---

[1] On July 1, 2018, the newly created Department of Children, Youth, and Families (DCYF) took over child welfare duties that were formerly the responsibility of the Department of Social and Health Services (DSHS). RCW 43.216.906. Thus, in this opinion, the "Department" means DSHS before July 1, 2018, and DCYF after July 1, 2018.

[2] Indian Child Welfare Act, 25 U.S.C. § 1901.

[3] Washington State Indian Child Welfare Act, chapter 13.38 RCW.

I

F.Y.O., an Indian child,[4] was born in March 2015 and will be five years old as of March 2020. F.Y.O. has lived his entire life in the care of a maternal aunt. He has never lived with his parents.

In April 2015, F.Y.O. was found dependent as to his mother.[5] The identity of F.Y.O.'s father was unknown at that time.

In July 2015, F.Y.O. was found dependent as to the unknown father. The court entered an order of dependency and a dispositional order requiring the unknown father to come forward, contact the Department social worker for appropriate referrals, and establish paternity. Michael Foster established paternity in December 2015.[6]

In February 2016, after a review hearing, the court ordered Foster to participate in a chemical dependency evaluation, a domestic violence assessment, an age appropriate parenting class, a psychological evaluation with a parenting component, and random urinalysis testing. The court's order also required Foster to obtain safe, stable, and drug/alcohol free housing, and maintain regular visitation twice per week with F.Y.O.

In July 2018, the Department petitioned to terminate Foster's parental rights. The Department alleged, in pertinent part, that all ordered and necessary services had been offered or provided and there was little likelihood that

---

[4] F.Y.O. qualifies as an "Indian child" under ICWA, 25 U.S.C. § 1903(4), because he is eligible for enrollment as a member in the Fort Belknap Indian Community.

[5] The mother is not a party on appeal.

[6] Foster is also the father of S.Y.O., born in March 2016. He voluntarily terminated his rights to S.Y.O. Those rights are not at issue here.

conditions would be remedied such that F.Y.O. could be returned to Foster within the near future. It also alleged that active, but unsuccessful, efforts were made to provide remedial services and to prevent the breakup of the Indian family and that placing F.Y.O. in Foster's custody would likely result in serious emotional or physical harm to the child.

The termination trial took place over five days in April 2019. Foster did not attend the first three days of trial.[7] At the hearing, the court considered the testimony of Tim Cole (the Department social worker assigned to Foster) Louise Doney (a Fort Belknap Tribal representative), Dr. Dana Harmon (a psychologist), Minu Ranna-Stewart (a clinical supervisor at Harborview Center for Sexual Assault and Traumatic Stress), Joey Johnson (an intervention treatment supervisor at Evergreen Recovery Centers), Elisabeth Yaroschuk (the court-appointed special advocate (CASA) assigned to F.Y.O.), and Foster, and admitted 46 exhibits into evidence.[8]

On May 3, 2019, the trial court terminated Foster's parental rights. After entering numerous factual findings, the court concluded that the Department had established the necessary statutory factors by clear, cogent, and convincing evidence and that termination was in F.Y.O.'s best interests. It also concluded that the Department had proved, beyond a reasonable doubt, that placing F.Y.O.

---

[7] When he finally appeared on the fourth day of trial, Foster blamed his absence on being sick and "trying to sleep." Foster did not notify anyone about his illness, he claims, because he "wasn't able to charge [his] phone."

[8] The court also considered the testimony of two additional witnesses, both of whom were service providers for S.Y.O.

in Foster's custody would likely result in serious emotional or physical harm to the child.

Foster appeals. We discuss additional facts in the relevant sections below.

II

To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). First, the Department must prove the six termination factors enumerated in RCW 13.34.180(1) by clear, cogent, and convincing evidence.[9] K.N.J., 171 Wn.2d at 576-77. Once the Department establishes these statutory factors, the trial court must then make a finding of current unfitness before parental rights can be terminated. In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016). If this burden is satisfied, termination may be ordered if the Department establishes, by a preponderance of the evidence, that it is in the best interests of the child. RCW 13.34.190(1)(b); K.N.J., 171 Wn.2d at 577.

When termination proceedings involve an Indian child, as is the case here, ICWA and WICWA require the trial court to make two additional determinations. First, the court must find by clear, cogent, and convincing evidence that the Department made "active efforts" to help the parent remedy his or her parental deficiencies. 25 U.S.C. § 1912(d); RCW 13.38.130(1); In re Dependency of A.M., 106 Wn. App. 123, 130-31, 135, 22 P.3d 828 (2001). Second, the court

---

[9] "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

must find that the Department proved, beyond a reasonable doubt, that the parent's continued custody of the child is likely to result in "serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); RCW 13.38.130(3).

On review, we will uphold the trial court's factual findings if they are supported by substantial evidence.[10] In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Unchallenged findings are verities on appeal. In re Dependency of M.S.R., 174 Wn.2d 1, 9, 271 P.3d 234 (2012). We defer to the trial court on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

### III

Foster contends that the "Department failed to establish nearly every" statutory prerequisite for termination. We disagree.

### A

Foster first argues that because the Department did not offer services to help him avoid future contact with F.Y.O.'s mother, it failed to offer all necessary services capable of correcting parental deficiencies.

In order to terminate parental rights, the Department has a statutory obligation to provide all services that the court ordered,[11] as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). "Necessary

---

[10] "Substantial evidence" means "evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009).

[11] Foster does not dispute that the Department offered or provided all ordered services.

services" are those services "needed to address a condition that precludes reunification of the parent and child." In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014). The Department must tailor the services it offers to meet each individual parent's needs. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

Here, the trial court found the Department had offered or provided Foster all necessary services. Foster challenges this determination, but it is supported by the following unchallenged findings, which are now verities:

> [2.12(b)(iv)] Parties agreed at a shared planning meeting that the father needed an additional service after he absconded with the child [F.Y.O.] for four days. The service identified was CBT [cognitive behavioral therapy] treatment provided by Minu Ranna-Stewart at Harborview Center for Trauma and Sexual Assault.
> . . . .
> [2.12(d)(vi)] Minu Ranna-Stewart testified she worked with the father for a short period specifically on identifying ways to address the father's awareness of the safety risk posed by the mother and his role in keeping his children safe.

Substantial evidence also supports the trial court's finding. Foster's cognitive behavioral therapy service was tailored to raise Foster's awareness "of potential risks and safety concerns of the children being around their mom" and to help him "evaluate or understand what his role is in keeping the children safe." Nothing in the record supports Foster's assertion that the Department failed to offer a service that would help him to avoid future contact with F.Y.O.'s mother.

Foster also argues that, although the Department "provided some direct financial assistance, [it] did not provide any services actually designed to help [him] achieve long-term stability." He claims that the Department should have provided him with life coaching, budgeting, and motivation services. However,

none of these services were "identified by any service providers who worked extensively" with Foster as necessary, nor is there evidence in the record to show that Foster requested any such services prior to the termination hearing. A parent's belated request for a service is not sufficient to convert that service to a necessary one.

B

Next, Foster contends that the termination order must be reversed because the Department failed to prove that he was not capable of parenting F.Y.O. in the "near future."

In termination proceedings, the Department must prove that there is "little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus of this factor is whether parental deficiencies have been corrected. In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005) (one year not "foreseeable" or "near future" for six-year-old child who had never lived with the mother and the mother had been receiving services for six years); In re Dependency of T.R., 108 Wn. App. 149, 166, 29 P.3d 1275 (2001) (one year was beyond the near future for a six-year-old who had been in foster care her entire life).

In this case, the trial court found the Department satisfied its burden under RCW 13.34.180(1)(e). Ample evidence supports this determination, including the following unchallenged findings:

[2.12(e)(i)] The court identified two distinct time periods in the case. The first from entry of orders regarding services until the date in August 2017 when Mr. Foster absconded with [F.Y.O.] During that time, the father completed numerous services and participated in visitation regularly resulting in expanded visitation, and the intention at that time overwhelmingly was to return [F.Y.O.] home to the father. The father was developing a bond and working toward stability and had housing during this period.

[2.12(e)(ii)] The second time period followed the father's absconding with the child [F.Y.O.]. In this time period he completed a relapse prevention plan, completed [domestic violence] treatment after extensive delays, and participated in services with Minu Ranna-Stewart regarding the safety of his contact with [F.Y.O.'s mother]. Visitation was reset to twice per week monitored. During this time he was only visiting a maximum of once a week and his explanation that he was busy with services and work was not found credible because during the prior time period he actively participated in more services and still managed to increase visitation including visitation with both boys. The father missed visitation during this time. Once instance of a missed visit occurred near [F.Y.O.'s] fourth birthday where the father also failed to notify [social worker] Cole and the child was transported for the visit. Court orders also reflect the fact that things were not going as well for the father as they had been in the first 18 months.

[2.12(e)(iii)] While the father made substantial progress in the first 18 months, as a result of bad choices he simply has not been able to recover over the last 20 months with evidence of relapses, lost apartment, and inability to establish stability or to regularly maintain available visitation.

[2.12(e)(iv)] The incident where the father kept [F.Y.O.] for four days in a hotel with the mother . . . was important because

a. He knew the mother was noncompliant with services and likely utilizing substances.

b. A no contact order was in place and prior arrests demonstrated knowledge of the risk he was taking of getting arrested during the time he had the child [F.Y.O.] in his care.

c. He and [the mother] have a volatile relationship and engaging with her while having [F.Y.O.] in his care raised risk of exposure of [F.Y.O.] to experiencing domestic violence.

d. The father's contact with [the mother] has also resulted in the loss of his apartment because the complex requested he leave due to the fights occurring between the father and [the mother].

e. While the CPS investigation found no evidence of physical harm the situation put the child at substantial risk for the reasons outline above.

f. It was clear from father's testimony that he understands the risk of ongoing contact with [the mother] but continued to place [F.Y.O.] at risk choosing his desires over the best interest of [F.Y.O.] and therefore lacks the ability to protect. His behavior showed he prioritized his interests and those of [the mother] over those of [F.Y.O.].

[2.12(e)(v)] Furthermore, after this incident the father maintained a relationship with [the mother]. He admitted contact in May of 2018 and in January of 2019 but the Court suspects more contact because the father believed the mother's fifth child could have been biologically his child. Evidence later showed that it was not his child.

[2.12(e)(vi)] Minu Ranna Stewart [sic] explained that the father expressed a desire to facilitate contact with [the mother] and/or to co-parent with her. He did so disregarding the potential risk to [F.Y.O.]. The father himself recognized the danger of being with [the mother] because when he was with her he made poor choices. By having ongoing contact he prioritized his own interests and those of [the mother] above the interests of his child [F.Y.O.].

[2.12(e)(vii)] The father admitted a recent relapse in March, 2019 on alcohol, and the timing of his relapses have, in the past, correlated with his contact with [the mother]. The recent relapse occurred despite having attended relapse prevention showed ongoing risk to the child. The father admitted he had no current AA sponsor.

[2.12(e)(viii)] The father's participation in domestic violence was not completed until April 2019. The father's lack of attendance was the primary reason for delay in completion of this service.

[2.12(e)(ix)] The father appears to have a sincere belief that he will be ready in 90 days to take care of the child and obviously loves [F.Y.O.] However, the evidence since the setback nearly twenty (20) months ago indicates that such a belief is unrealistic. The child's near future is a matter of months not years and the child cannot continue to wait for Mr. Foster.

Given these uncontested findings, it is clear that the Department established there to be little likelihood that Foster could correct his deficiencies in a future near enough to successfully and safely parent F.Y.O.

C

Foster next argues that the Department failed to prove continuation of his relationship with his son clearly diminished F.Y.O.'s prospects for early integration into a stable and permanent home under RCW 13.34.180(1)(f). This argument turns on Foster's belief that he would be ready to parent F.Y.O. within 90 days of the termination hearing. Because we have already rejected Foster's readiness argument, we also reject his argument under RCW 13.34.180(1)(f).

D

Next, Foster contends his arguments show that the Department did not meet its burden to prove that he is an unfit parent.[12] But because none of his arguments on appeal are persuasive, we disagree. There was ample evidence

---

[12] To establish current unfitness in a termination proceeding, the Department must prove by clear, cogent, and convincing evidence that the parental deficiencies "prevent the parent from providing the child with 'basic nurture, health, or safety.'" In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014) (quoting RCW 13.34.020).

presented to support the trial court's determination that Foster is an unfit parent.[13]

E

Foster also contends that the Department failed to prove that termination is in F.Y.O.'s best interests. "[T]he goal of a dependency hearing is to determine the welfare of the child and his [or her] best interests." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). In order to terminate a parent-child relationship, the trial court must determine by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(1)(b). The factors involved in determining the best interests of a child are not capable of specification; each case must be decided on its own facts and circumstances. Aschauer, 93 Wn.2d at 695. Therefore, we place a "'very strong reliance on trial court determinations of what course of action will be in the best interest of the child.'" In re Matter of Pawling, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) (quoting In re Welfare of Todd, 68 Wn.2d 587, 591, 414 P.2d 605 (1966)).

Here, the court found termination of the parent-child relationship to be in F.Y.O.'s best interests, explaining that:

> CASA and [social worker] Cole testified that adoption is in the child's best interest and that permanence will help the child feel more secure and safe in his placement. The Court concludes that termination of parental interest is in the best interest of the child due to the father's inability to remedy his parental deficiencies and his right for a safe and stable home.

---

[13] For example, Foster testified to living in seven different locations during the dependency period. At trial, he testified about renting a room at a shared housing location and acknowledged that it was not an appropriate place for F.Y.O. to live.

The social worker testified that F.Y.O. had resided with his maternal aunt for four years, was "extremely bonded" with the placement, and had "a very set routine" and "consistency" in his life. The CASA testified, "[B]ased on the amount of time that has passed and the amount of progress or lack of progress that has been made, I would agree; I would encourage the Court to terminate parental rights."

"Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period'" while the parent attempts rehabilitation. T.R., 108 Wn. App. at 167 (alteration in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). If the health and safety of the child conflicts with the rights of the parent, "the rights and safety of the child should prevail." RCW 13.34.020. The record supports the court's finding that termination is in F.Y.O.'s best interests.

IV

A

Foster contends the Department failed to exert active efforts to reunite him with F.Y.O. Specifically, he argues the Department did not help him identify housing resources, never involved the Tribe in coordinating services, and failed to integrate culture into his case plan. Again, we disagree.

Before a parent's rights to an Indian child can be terminated, ICWA requires that:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d); RCW 13.38.130(1) (WICWA's identical requirement).

Under WICWA, "active efforts" means "timely and diligent efforts to provide or procure such services, including engaging the parent or parents or Indian custodian in reasonably available and culturally appropriate preventive, remedial, or rehabilitative services. This shall include those services offered by tribes and Indian organizations whenever possible." RCW 13.38.040(1)(a).

Although ICWA does not define "active efforts," the term is defined in ICWA's implementing federal regulations, 25 C.F.R. § 23.2.[14] The federal regulations provide examples of what may be included as active efforts, including:

> (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
>
> (2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
>
> (3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

---

[14] "Active efforts," under the federal regulations, "means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. . . . Active efforts are to be tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2.

(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6) Taking steps to keep siblings together whenever possible;

(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available; [and]

(11) Providing post-reunification services and monitoring.

25 C.F.R. § 23.2.

Here, the trial court found "the Department utilized active efforts to prevent the break up of the Indian family by providing both financial assistance, transportation assistance and substantial help and motivation to encourage the father's ongoing participation in services."

Several uncontested findings establish that the Department, indeed, actively identified services for Foster, encouraged Foster to participate in

services, supported Foster's regular visitation of F.Y.O., and provided Foster with financial and transportation assistance.

[2.12(d)(vii)]  The father reports working off and on throughout this case.  He admitted receiving help with rent, VISA cash cards as well as ORCA cards.  The [social worker] also provided rides to the father.

[2.12(d)(viii)]  The Department held a shared planning meeting that the father attended to discuss services.  The [social worker] also regularly met with the father and provided encouragement and addressed barriers to participation by providing financial support and transportation support.  The father texted the social worker gratitude for his help restarting domestic violence services at a time when the father's lack of participation threatened his ability to participate in ongoing treatment.

Additionally, the social worker testified about providing services that matched Foster's preferred hands-on learning approach.  He spoke about having "a long-time relationship" with Foster, always being supportive of Foster and of Foster being with his children, and having numerous "hands-on" conversations with Foster about the importance of obtaining stability.  Foster, at trial, agreed that the social worker had tried to help him and was "absolutely" supportive.

The social worker also testified of notifying the Fort Belknap Tribe— located in parts of North Dakota and Montana—of these dependency proceedings and that a tribal representative participated telephonically at review and planning hearings.  There was no testimony that the Fort Belknap Tribe had a presence, or was able to offer services, in Washington.  Nevertheless, Doney, the Fort Belknap representative at trial, agreed that the Department had exerted active efforts in this case.  She stated that "the Department has reached out to

- 15 -

[Foster] and . . . supported him while he was—he needed financial assistance with his rent, getting a job and that sort of thing so he can support his children."

Regarding housing assistance, Foster received that service from another community resource. He testified that a navigator at Catholic Community Services had been helping him locate affordable housing for "almost a year."

In sum, the record supports the trial court's finding that the Department exerted active efforts to reunite Foster with F.Y.O.[15]

B

Under 25 U.S.C. § 1912(f), the Department has the burden of proving "beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." WICWA imposes an identical requirement. See RCW 13.38.130(3). Here, the trial court found the Department satisfied this burden, stating:

> [T]he Court finds that there is evidence supporting beyond a reasonable doubt that [F.Y.O.] is at risk of serious emotional or physical damage. That conclusion is based on the extended period of time the child was waited for stability and permanence, the lack of evidence that the father will be able to do so in the near future, and also because of the father's lack of good decision making and the risk of emotional/physical damage due to ongoing contact with [the mother].

---

[15] In a statement of additional authorities, Foster cites to In re Parental Rights to D.J.S., No. 36423-2-III, (Wash. Ct. App. Jan. 28, 2020), http://www.courts.wa.gov/opinions/pdf/364232.pdf, as a case reversing an order of termination wherein the Department failed to engage in "active efforts" as required by ICWA and WICWA. D.J.S., however, is factually distinguishable from the present matter. There, Division Three discussed how the Department made little more than service referrals and concluded that "active efforts" required much more. See D.J.S., No. 36423-2-III, slip op. at 40-41.

- 16 -

Foster contests this finding, but substantial evidence supports it. The Department's qualified Indian expert, Doney, testified that placing F.Y.O. in Foster's custody would likely result in serious emotional or physical damage to the child because (1) the dependency had "been open for quite some time," (2) Foster had "not demonstrated stability," (3) Foster was "not consistent with his visitation," and (4) Foster's instability could negatively affect F.Y.O.'s "social, emotional, cognitive, and academic outcome."

In addition to Doney's testimony, the trial court orally ruled that Foster's poor choices posed an ongoing risk to F.Y.O.,

> Regardless of whether there is an active no-contact order or any other prohibition on contact, the reality is that being with [the mother] shows poor decision-making that puts [F.Y.O.] at risk. It is clear from Mr. Foster's testimony that he understands those risks. It's also clear that he intends to continue to have contact with [the mother] and would do so with [F.Y.O.] It is clear to the Court that . . . he is choosing those desires over the best interests of his child, and it shows, quite frankly, to the Court that he doesn't have the ability to make decisions necessary to protect [F.Y.O.]

The record supports the trial court's finding, beyond a reasonable doubt, that placing F.Y.O. in Foster's custody would likely result in serious emotional or physical harm to the child.

We affirm the court's termination order.

_____
Dwyer, J.

WE CONCUR:

_____        _____
Andrus, J.                       Appelwick, C.J.

- 17 -