**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientlawareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>A.W.,<br><br>A Minor Child. | No. 82799-5-I<br><br>ORDER GRANTING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

The respondent, Department of Children, Youth, and Families, has filed a motion for reconsideration of the opinion filed on August 8, 2022. The appellant, A.K., has filed a response. The court has determined that the motion should be granted, the opinion withdrawn, and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted; and it is further

ORDERED that the opinion filed on August 8, 2022 is withdrawn; and it is further

ORDERED that a substitute opinion shall be filed and published in the Washington Appellate Reports.

Andrus, C.J.

Coburn, J.                    Mann, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>A.W.,<br><br>A Minor Child. | No. 82799-5-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

ANDRUS, C.J. — Shortly after A.K. gave birth to A.W., the Department of Children, Youth, and Families (Department) filed a dependency petition and sought an ex parte order allowing the Department to take A.W. into custody ("pick-up order") based on the mother's drug use during pregnancy and evidence of an inability to care for the infant. The mother's attorney contacted the court, requesting a hearing before the court signed the pick-up order. The trial court denied that request and signed the order without first holding a hearing.

At the subsequent shelter care hearing, the trial court denied the mother's motion to vacate the pick-up order but nonetheless found that shelter care was no longer necessary because of the steps she had taken to obtain drug treatment and parenting support, and it returned the child to A.K. The court subsequently dismissed the dependency proceeding.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

A.K. sought discretionary review of the order denying her motion to vacate, arguing that the trial court violated due process by issuing a pick-up order without first affording her a hearing and that the court violated both the Indian Child Welfare Act of 1978[1] (ICWA) and the Washington State Indian Child Welfare Act[2] (WICWA) in granting the pick-up order. This court granted discretionary review.

We conclude that entering a pick-up order without first holding a hearing did not violate A.K.'s due process rights. We also conclude that when the Department has reason to believe that a child is an Indian child under ICWA and WICWA, the heightened removal standard in those statutes applies to ex parte pick-up order requests. Because the Department had reason to know that A.W. is an Indian child—information not shared with the trial court—and the trial court applied an incorrect legal standard in assessing the Department's evidence at that stage of the proceeding, the trial court erred in not vacating the pick-up order. [3]

## FACTS

A.K. gave birth to A.W. on April 19, 2021.[4] A.K. had a long history of struggling with heroin addiction and reported using the drug intermittently, including throughout her pregnancy.[5] Because she did not realize she was pregnant until the month before she gave birth, the mother received very little prenatal care. On March 25, 2021, three weeks before A.W.'s birth, the mother

---

[1] 25 U.S.C. §§ 1901-1963.

[2] Ch. 13.38 RCW.

[3] While we reverse the pick-up order, we need not remand this matter to the trial court to vacate the order because the dependency petition has already been dismissed.

[4] The father, D.W., is not a party to this appeal.

[5] The facts in this opinion are based in large part on allegations and statements from the dependency petition and the mother's shelter care hearing brief. As both parties refer to the allegations in the petition, which were certified by social worker Amber Grey to be true and correct, these appear to be undisputed facts.

started a methadone program with Therapeutic Health Services (THS). When A.W. was born, both mother and infant tested positive for methadone and A.W. exhibited signs of withdrawal, including tremors and poor skin tone, and was not eating well. The hospital began providing therapeutic morphine treatment. It also notified the Department, and social worker Amber Grey opened a Child Protective Services investigation.

The mother visited A.W. in the hospital regularly. Hospital staff initially noted that she provided loving and appropriate care for A.W. but later reported concerns that A.K. was "apathetic" when the baby cried. According to hospital staff, she was often distracted by her phone, failed to engage with parent educators, and allowed others to care for A.W. The hospital also reported that the mother was sleeping often and failing to wake when A.W. cried. They described the mother as a "poor historian" as she could not determine when she had last used drugs and had no long-term housing plan. A.K. reportedly told a hospital social worker that she "want[ed] to do methadone on her own, and was unwilling to engage in any other services typically associated with sobriety, such as support groups."

According to Grey, the mother could not tell her when she discovered she was pregnant or when she started methadone treatment. A.K. informed Grey that she had yet to engage with a THS counselor or to participate in any of its support groups.

At the time of A.W.'s birth, the mother was living with her friend, Jordan Ford-Nyce and Ford-Nyce's great uncle, Gary Ford, in a house in Snohomish. As

part of her investigation, Grey reached out to both Ford-Nyce and Ford to better understand A.K.'s support system and living situation. Both were supportive of A.K.'s efforts to obtain sobriety and were willing to have her and A.W. stay in their home. While Ford-Nyce worked part time in Portland, Oregon, and would be gone for several days each week, Ford could be home consistently and offered to teach A.K. parenting skills, such as changing the baby and making bottles. Grey felt their home was clean and well kept, and appeared to be safe.

On April 22, the Department held a family team decision meeting with A.K. At the meeting, A.K. agreed to participate in random urinalysis testing (UA), and to engage in services, including an in-home parenting class. She further agreed to follow Safe Sleep guidelines and have either Ford or Ford-Nyce present for late night feedings. Should she relapse, A.K. agreed to notify the Department and ensure that A.W. was in the care of a safe and sober adult. Ford-Nyce, who also attended the meeting, agreed that either she or Ford would check in with A.K. once a day and report any concerns to the Department.

Following the meeting, Grey began making necessary referrals for these services. She referred A.K. to an in-home parenting class and UA testing. Grey notified A.K. of the UA referral by text message. A.K. never responded to it and did not complete the UA. She claimed she had not seen the text until three days after Grey sent it. On April 26, A.K. completed a UA at THS. While the UA was negative, it was not "observed" as the Department required.

On April 28, Grey learned that A.K. had not appeared for a scheduled in-person meeting with her THS counselor. Grey also learned that the hospital planned to discharge A.W. the following Monday, May 3.

On April 29, the Department held a second family team decision meeting. At the meeting, Grey shared some of the Department's concerns and A.K. offered explanations for her behaviors. For example, A.K. explained that she missed her meeting with the counselor because she "pee[d] her pants" in the car and had to go home to change, and she said she allowed others to care for A.W. at the hospital because the hospital staff had told her to rest. The Department nevertheless informed A.K. that it intended to file a dependency petition and a motion to take A.W. into custody. A.K. asked that Ford-Nyce be allowed to act as A.W.'s caregiver in the event that A.K. was not permitted to do so.

The next morning, on Friday April 30, A.K.'s attorney e-mailed the Department, asking for a third family team decision meeting and requesting that she be notified of any ex parte requests with the court, including any pick-up order requests. Later that morning, the Department responded and informed counsel that it had filed the petition.

In the petition, the Department represented to the court that, among other things, it did not have reason to know A.W. was an "Indian child" under ICWA and WICWA. According to the petition, A.K. denied having any Native ancestry, and Grey was unable to contact A.W.'s father to ask about his ancestry because he was in jail in Oregon.

The Department also filed an ex parte motion for an order to take the child into custody with the dependency petition. When A.K.'s counsel learned about the motion, she e-mailed the court and requested "a hearing on the record prior to any ex parte order being signed." The trial court reviewed this request and the petition and elected to sign the pick-up order without a hearing. The court found that the Department had demonstrated "a risk of imminent harm to the child in the child's home," that the Department's risk assessment constituted "reasonable efforts to prevent or eliminate the need for removal of the child from the child's home," and that "services previously offered or provided to the parent(s) have not remedied the unsafe conditions in the home." The order allowed the Department to take A.W. into custody and place her in shelter care for not more than 72 hours.

When the hospital discharged A.W. on Monday, May 3, the Department placed her with Ford-Nyce and Ford. The court set a shelter care hearing for May 5 at which time A.K. moved to vacate the pick-up order and filed a brief in opposition to the Department's request for shelter care. A.K. argued that the pick-up order violated ICWA, WICWA, and due process. At A.K.'s request, the court continued the hearing to the next day to allow the court "to review the extensive briefing provided by the parties."

On May 6, the court held the shelter care hearing and considered A.K.'s motion to vacate the pick-up order. Contrary to what was alleged in the dependency petition, the Department agreed that ICWA and WICWA applied because it had reason to know A.W. was an Indian child. The father, D.W., was not present at the hearing but was represented by counsel who informed the court

that D.W. had Native American ancestry. He further informed the court that, because D.W. was involved in another dependency case in Cowlitz County, his Native ancestry would have been known by the Department. The Department did not contest this fact.

The court found that the Department's omission of A.W.'s Native heritage from the petition was "immaterial" for purposes of the pick-up order and concluded that, although ICWA and WICWA applied, they "do not alter the standard by which the Court needs to assess the order (RCW 13.34.050)." The court further rejected A.K.'s due process challenge to the ex parte entry of the pick-up order.

The trial court reaffirmed that the pick-up order was compliant with RCW 13.34.050 and explained that it signed the order because

a. The mother was struggling and has struggled with substance abuse for a significant period of time.
b. She has an 8-year-old daughter not in her custody.
c. The father was in jail in Oregon and unavailable.
d. There were discrepancies as to the mother's reported drug use.
e. The current placement could not identify when mother was using.
f. One of the mother's supports, Jordan, lives and works in Portland part time, leaving the monitoring of the care of the child up to Gary Ford, Jordan's great uncle.
g. Based on these facts the Court found it was provided with sufficient information to meet the standard of RCW 13.34.050.

The court nevertheless concluded that shelter care was no longer necessary. The court found that since it signed the pick-up order, A.K. had engaged with services by completing an intake with the Parent-Child Assistance Program, meeting with her THS counselor, and starting a parenting class. It also found that the mother had provided multiple negative UAs to the Department in the intervening days. The court denied the Department's request for shelter care and

- 7 -

No. 82799-5-I/8

returned A.W. to A.K. as long as she lived with Ford-Nyce and Ford and complied with various conditions.

A.K. sought, and this court granted, discretionary review of the order denying the mother's motion to vacate the pick-up order. Although the trial court subsequently dismissed the dependency petition, making the appeal technically moot, a commissioner of this court concluded that review was warranted to decide whether the ex parte pick-up order violated A.K.'s procedural due process rights and whether ICWA and WICWA imposes a heightened standard for removal at the pick-up order stage.

ANALYSIS

Due Process

A.K. first argues that the trial court violated her procedural due process rights under Mathews[6] by denying her request for a hearing before it entered a pick-up order. We disagree.

Parents enjoy fundamental liberty interests in "the care, custody, and management of their child[ren]." Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); In re Dependency of K.N.J., 171 Wn.2d 568, 574, 257 P.3d 522 (2011). "The due process clause of the Fourteenth Amendment to the United States Constitution protects a parent's right to the custody, care, and companionship of her children," a right which "cannot be abridged without due process of law." In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). "Due process requires that parents have notice, an opportunity to be heard, and

---

[6] Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

- 8 -

No. 82799-5-I/9

the right to be represented by counsel." Id. at 611. We review alleged due process violations de novo. In re Dependency of W.W.S., 14 Wn. App. 2d 342, 353, 469 P.3d 1190 (2020).

In assessing whether a parent has been provided procedures that comport with the requirements of due process, we consider (1) the private interests affected, (2) the risk of error created by the procedures used and the probable value of any additional procedural safeguards, and (3) the State's interest. Key, 119 Wn.2d at 611; Mathews, 424 U.S. at 335.

Here, A.K.'s interest in challenging the removal of her child is a significant one. Parental rights are "'perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court].'" In re Welfare of M.B., 195 Wn.2d 859, 868, 467 P.3d 969 (2020) (alteration in original) (quoting Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion)). We agree with A.K. and the State that the mother has a strong interest in retaining custody of her daughter.

But A.W. also has private interests at stake here. A child's liberty interests in dependency proceedings include the interest in "being free from unreasonable risks of harm and a right to reasonable safety; in maintaining the integrity of the family relationships, including the child's parents, siblings, and other familiar relationships; and in not being returned to (or placed into) an abusive environment over which they have little voice or control." In re Dependency of M.S.R., 174 Wn.2d 1, 20, 271 P.3d 234 (2012). A.W.'s interests may not be aligned with those of her mother if her health and safety are at risk.

No. 82799-5-I/10

The State's interest in a dependency proceeding is similarly "very strong." Id. at 18. According to our Supreme Court, in a dependency proceeding, the State "has a compelling interest in both the welfare of the child and in 'an accurate and just decision.'" Id. (quoting Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)). A.K.'s right to retain custody of her child does not outweigh her child's right to safety and the State's right to ensure that child's safety.

That leaves us with an evaluation of the risk of an erroneous deprivation of rights that the existing procedures create and the probable value, if any, of providing additional procedural safeguards. M.B., 195 Wn.2d at 869. Here, we assess whether the procedures outlined in RCW 13.34.050 are sufficient to protect a parent from an unacceptable risk of the erroneous deprivation of custodial rights and the value, if any, of requiring a court to conduct a hearing before granting a Department request for an ex parte pick-up order. A.K. argues that the procedure creates a significant risk to her rights because the court is relying solely on the Department's allegations. But in light of the other procedural protections in the statute, we cannot agree that the risk of error is significant.

While the dependency statute allows the Department to request, and the court to order, the removal of children from their parents without a hearing, it provides numerous safeguards to ensure that the Department's request is based in fact and law and provides the parents with a prompt opportunity to address the Department's allegations, all designed to avoid an erroneous deprivation of parental rights.

- 10 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

First, the Department must meet a high evidentiary burden before a court can issue an ex parte pick-up order. The Department must file a petition with the court alleging that the child is dependent and that the child's health, safety, and welfare will be "seriously endangered" if not taken into custody. RCW 13.34.050(1)(a). The Department must also file an affidavit or declaration in support of the petition, setting out the "specific factual information evidencing reasonable grounds that the child's health, safety, and welfare will be seriously endangered if not taken into custody and at least one of the grounds set forth demonstrates a risk of imminent harm to the child." RCW 13.34.050(1)(b). The court may enter the order only if, based on the Department's evidence, it finds reasonable grounds to believe that the child is dependent and that the child's health, safety, and welfare will be seriously endangered if not taken into custody. RCW 13.34.050(1)(c).

If the Department cannot meet this evidentiary standard and fails to demonstrate a risk of imminent harm, the statute specifically requires the Department to notify the parents of the request to remove their child and to provide the parents with an opportunity to be heard before the court can enter the pick-up order. RCW 13.34.050(2).

Second, if the court grants a pick-up order, it must conduct a shelter care hearing within 72 hours to determine whether the child may be safely returned to the home. RCW 13.34.060(1), 065(1)(a). At the shelter care hearing, parents have a right to be present, to be represented by counsel, and to present testimony regarding the need or lack of need for shelter care. RCW 13.34.065(3). Any

No. 82799-5-I/12

hearsay evidence "must be supported by sworn testimony, affidavit, or declaration" of the person giving evidence. RCW 13.34.065(2)(c).

The court conducting the shelter care hearing must verify on the record that the parents were given notice of the hearing and decide if the child can be safely returned home and confirm that the Department had made efforts to place the child with a relative. RCW 13.34.065(4)(a)-(c). The court must also determine if services were provided to the family to prevent the need for removal of the child, whether the placement proposed by the Department is the least disruptive and meets the child's needs, and whether the child is an Indian child under ICWA and WICWA. RCW 13.34.065(4)(d)-(h).

Under this statutory scheme, there may be a risk that a party's parental rights are erroneously impacted but the impact is short in duration—72 hours, at most—and the combination of the predeprivation evidentiary requirements and the postdeprivation safeguards mitigate that risk by providing for a prompt review of the removal decision, and affording parents the opportunity to rebut the Department's allegations on the merits. The statute thus balances the government's interest in protecting the child from imminent harm against the risk of erroneous deprivation of a parent's fundamental interest in the care and custody of their child. No more process is due.

In re Detention of Johnson, 179 Wn. App. 579, 322 P.3d 22 (2014), is instructive. In that case, this court rejected a procedural due process challenge similar to the one A.K. advances here. Under the statute at issue there, the involuntary treatment act (ITA), ch. 71.05 RCW, a crisis responder ordered

- 12 -

Johnson to be detained for 72 hours based on a finding that Johnson demonstrated "an imminent risk of harm." 179 Wn. App. at 582. Johnson argued that detaining her without first giving her the opportunity to challenge the crisis responder's finding violated her right to procedural due process. Id. at 585. This court held that the ITA provides adequate procedural safeguards to minimize the risk of an erroneous deprivation of a detainee's liberty. Id. at 590. While we recognized Johnson's significant liberty interest, we nonetheless concluded that this interest was outweighed by the State's paramount interest in public safety and that the predetention high evidentiary standard and the postdeprivation right to a prompt hearing provided adequate protection against an erroneous detention. Id. at 591.

As in Johnson, A.K. has an undeniably strong interest in parenting A.W., which the government impacted when it removed her child from her custody. However, just as Johnson's recognized liberty interest was outweighed by the State's interest in public safety, so too is A.K.'s interest in parenting A.W. outweighed by the government's interest in protecting children from the risk of imminent harm and A.W.'s interest in being free from such harm. And as in the ITA, there are high evidentiary standards that the Department must meet before the pick-up order may issue and there is a mandatory, prompt postdeprivation hearing to allow the parent the opportunity to challenge the veracity and sufficiency of the State's evidence.

Moreover, A.K.'s requested hearing before the issuance of a pick-up order would provide only minimal additional protections while creating significant risks to the children the Department must protect. Because removal is allowed only when

a risk of harm is imminent, delaying that removal for a court hearing would delay the Department's ability to ensure a child's safety. We also believe requiring courts to conduct such hearings would be impractical and offer minimal additional protections to the parents who would have little time to obtain counsel, and almost no chance to gather evidence or arrange for witnesses to testify to refute Department evidence of their inability to parent the child safely. Issuing the ex parte pick-up order under RCW 13.34.050 without first conducting a hearing to allow A.K. to challenge the Department's evidence did not violate her procedural due process rights.

Emergency Pick-Up Order under ICWA

A.K. next argues that the pick-up order violated ICWA and WICWA because the Department failed to prove, and the court did not find, that A.W. faced an imminent risk of physical harm.

We review the trial court's denial of a motion to vacate an order under CR 60(b) for abuse of discretion. Mitchell v. Wash. State Inst. of Pub. Policy, 153 Wn. App. 803, 821, 225 P.3d 280 (2009). An abuse of discretion occurs when the trial court applies the wrong legal standard or bases its ruling on an erroneous view of the law. State v. Cawyer, 182 Wn. App. 610, 616, 330 P.3d 219 (2014); In re Marriage of Shortway, 4 Wn. App. 2d 409, 418, 423 P.3d 270 (2018).

The trial court held that ICWA and WICWA "do not alter the standard by which the Court needs to assess the pick-up order (RCW 13.34.050)." The Department asks this court to affirm this decision and hold that the evidentiary

- 14 -

standard for the emergency removal of any child is "imminent risk of harm" whether that removal occurs under RCW 13.34.050, ICWA, or WICWA.

Congress enacted ICWA to remedy the historical destruction of Native families and communities while ensuring the safety of Native children. In re Dependency of Z.J.G., 196 Wn.2d 152, 157, 471 P.3d 853 (2020). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes . . . ." 25 U.S.C. § 1902. Washington enacted WICWA in 2011, and several of its provisions are identical or analogous to ICWA. In re Adoption of T.A.W., 186 Wn.2d 828, 843, 383 P.3d 492 (2016). ICWA and WICWA are generally interpreted coextensively unless one provides more protection than the other, in which case we apply the more protective act. In re Welfare of A.L.C., 8 Wn. App. 2d 864, 872-73, 439 P.3d 694 (2019). The statutes must "'be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" Z.J.G. 196 Wn.2d at 163-64 (quoting Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S. Ct. 2399, 85 L. Ed. 2d 753 (1985)).

ICWA generally applies to any "child custody proceeding" involving an "Indian child." 25 U.S.C. §§ 1911(a), 1912(a). Under ICWA, a "child custody proceeding" includes any "'foster care placement,'" defined as "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home . . . where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been

No. 82799-5-I/16

terminated."[7]  25 U.S.C. § 1903(1)(i).  Federal regulations provide that ICWA

applies to any state court proceeding involving the emergency removal or

placement of an Indian child.  25 C.F.R. §§ 23.103(a), 23.2.  See BUREAU OF INDIAN

AFFAIRS, U.S. DEP'T OF INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD

WELFARE ACT 12-13 (Dec. 2016) (BIA Guidelines).[8]

Under section 1922 of ICWA:

> Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child . . . from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child.

25 U.S.C. § 1922 (emphasis added).[9]  And in any emergency removal of an Indian

child, the state court must "[m]ake a finding on the record that the emergency

removal or placement is necessary to prevent imminent physical damage or harm

to the child."  25 C.F.R. § 23.113(b)(1).

RCW 13.34.050, however, uses a different standard for the emergency

removal of a child from a parent.  It provides:

> (1)    The court may enter an order directing a . . . child protective services official to take a child into custody if: . . . an affidavit or declaration is filed by the department in support of the petition setting forth specific factual information evidencing reasonable grounds that the child's health, safety, and welfare will be seriously endangered if not taken into custody and at least one of the grounds set forth demonstrates a risk of imminent harm to the child. "Imminent harm" for purposes of this section shall include, but not be limited to, circumstances of sexual abuse, sexual exploitation as defined in RCW 26.44.020, and a parent's failure to perform basic parental functions, obligations, and duties as the result of substance abuse; and (c) the court finds reasonable grounds to believe the child is

---

[7] WICWA defines a "child custody proceeding" in identical terms.  See RCW 13.38.040(3)(a).
[8] https://www.indianaffairs.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf [https://perma.cc/3AJ5-PBCA].
[9] WICWA contains an identical emergency removal provision.  See RCW 13.38.140(1).

dependent and that the child's health, safety, and welfare will be seriously endangered if not taken into custody.

(Emphasis added.)

In Z.J.G., 196 Wn.2d at 174, our Supreme Court explicitly stated that "ICWA provides a heightened standard for removal [of an Indian child] during emergency proceedings," comparing the "imminent physical damage or harm" language in 25 U.S.C. § 1922 to the standard for removing a child at a shelter care hearing under RCW 13.34.065(5)(a)(ii)(B). It went on to hold that when a court has "reason to know" a child is or may be an Indian child, "it must apply ICWA and WICWA standards." Id.

The Department contends the "imminent risk of physical damage or harm" standard in 25 U.S.C. § 1922 and RCW 13.38.140 is the same as the removal standard in RCW 13.34.050. We cannot agree. The definition of "imminent harm" under the state dependency statute is broadly worded to include a "failure to perform basic parental functions." Under Department regulations, "child abuse or neglect" includes any negligent treatment that creates a risk of injury "to the physical, emotional, or cognitive development of the child." WAC 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(5)(e)(iv) ("What is child abuse or neglect?"). By contrast, ICWA and WICWA both require a showing of "physical damage or harm" and would not be satisfied by a showing of emotional abuse or neglect. See Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,778 (June 14, 2016) (explaining the Bureau of Indian Affairs' position that a failure to ensure one's child attends school would not meet the federal standard).

- 17 -

We conclude that a Department motion for a pick-up order is an emergency proceeding to remove a child from its parents within the meaning of ICWA. Under RCW 13.34.050(1)(a), the Department cannot seek the emergency removal of a child without simultaneously filing a dependency petition. If the Department thus knows or has reason to know that the child is an Indian child, it must notify the court of this fact under RCW 13.34.040(3) and the court must apply the heightened emergency removal standard of 25 U.S.C. § 1922 and 25 C.F.R. § 23.113 and make the requisite factual finding to satisfy the federal regulations.

The trial court here erred in concluding that A.W.'s status as an Indian child was immaterial at the pick-up order stage. It was material because it triggered a different and heightened emergency removal standard under ICWA and required the trial court to make a specific factual finding—that removal was necessary to prevent imminent physical damage or harm to A.W. The trial court applied the wrong legal standard both in issuing the pick-up order and in denying A.K.'s motion to vacate that order. The trial court thus abused its discretion in denying A.K.'s motion to vacate the April 30, 2021 pick-up order.

<u>WICWA's "Active Efforts" Requirement</u>

Finally, A.K. contends the Department failed to make "active efforts" to prevent the removal of A.W. from her custody before seeking the ex parte pick-up order. The Supreme Court recently held that WICWA requires the Department to make active efforts before any involuntary foster care placement but recognized "that law enforcement and the [D]epartment may be called on to take children into protective custody under emergency circumstances where prior active efforts are

No. 82799-5-I/19

not possible or required by WICWA." In re Dependency of J.M.W., No. 99481-1, slip op at 10 (Wash. July 21, 2022), https://www.courts.wa.gov/opinions/pdf/994811.pdf. Where the Department has "prior contact with the family and reason to believe the child was at risk of physical damage or harm, it [has] an obligation to at least begin active efforts to avoid breaking up the family." *Id.* at 11-12. When active efforts are required, but not established, the child should be returned to their parents unless it is established that doing so would subject the child to substantial and immediate danger or threat of such danger. *Id.* at 12-13. It also held that at shelter care hearings, WICWA requires the trial court to "consider whether active efforts had been taken" and to return the child home when "removal or placement is no longer necessary to prevent imminent physical damage or harm to the child." *Id.* at 12-13.

Whether WICWA required the Department to engage in active efforts in this particular case is now moot as the trial court has dismissed the dependency petition. We therefore need not reach the issue in this appeal.

Reversed.[10]

Andrus, C.J.

WE CONCUR:

Colburn, J.          Mann, J.

---

[10] Because the dependency proceeding has been dismissed, there is no need to remand the matter to the trial court for the purpose of vacating the pick-up order.

- 19 -