**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientlawreports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Dependency of<br><br>M.L.W and I.A.W.,<br><br>                  Minor Children. | No. 83810-5-I (consolidated with<br>No. 83811-3-I)<br><br>PUBLISHED OPINION |

MANN, J. — T.W. appeals a trial court order terminating her parental rights to two of her children, I.A.W. and M.L.W. T.W. argues that (1) the Department of Children, Youth, and Families (Department) failed to provide family therapy as a necessary service, (2) the Department failed to prove continuation of T.W.'s parental rights diminished I.A.W. and M.L.W.'s integration into a stable home, and (3) the trial court erred in denying her older child, M.W.'s, motion to intervene. We affirm.

I

A

T.W. has three children: her son, M.W., was born in 2006, her daughter, I.A.W., was born in 2011, and her other daughter, M.L.W., was born in 2014. M.W. and I.A.W. have no father listed on their birth certificate. It is unknown whether M.L.W. has a father

No. 83810-5-I/2

listed on her birth certificate. The children are not Indian children as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the federal and state Indian Child Welfare Acts do not apply.

The family has been involved with child welfare agencies based on allegations of negligent treatment and T.W.'s substance use since 2006. This is T.W.'s third dependency case.[1]

In August 2018, the Department filed a dependency petition because of the family's Child Protective Services history and recent reports that detailed the children being left unattended at a park, visiting a neighbor's home and asking for food, and being found stealing and unattended at a grocery store. The children also witnessed a physical altercation between T.W. and her partner that M.W. intervened in, and M.L.W. was burned by hot oil in an unattended pan. The Department placed the children in licensed foster care, where they remained throughout the dependency. Agreed orders of dependency were entered on March 11, 2019.

Throughout the dependency, T.W. was ordered to participate in a psychological evaluation and agreed service recommendations, substance abuse evaluation and treatment, urinalysis testing (UA), and in-home services if reunification was imminent.

In late 2019, T.W. completed a psychological evaluation with Dr. Tatyana Shepel, a clinical psychologist with a specialty in neuropsychology. At both evaluation sessions, T.W. was under the influence of substances and displayed drowsy behavior and slurred speech. Dr. Shepel diagnosed T.W. with depression, anxiety disorder, and a

---

[1] In 2006, the first dependency was filed but was dismissed soon after when T.W. promised to return to Arizona and rely on the support of family members living there. In 2011, the second dependency was filed and lasted one year but was dismissed in 2012 after T.W. completed substance abuse treatment.

No. 83810-5-I/3

personality disorder. Dr. Shepel recommended treating T.W.'s mental health along with her substance use. But Dr. Shepel found T.W. not amenable to treatment because she had an outright denial of problems and did not understand the need to change.

In December 2019, the Department filed a termination petition, alleging that T.W. was not engaged in substance abuse treatment and that she had not complied with Dr. Shepel's recommendations.

In March 2020, T.W. entered Seadrunar, an inpatient substance abuse treatment program, after her first social worker, Natasha Utevsky, helped her find the program. Days before the Department's final reunification planning meeting, T.W. violated a serious rule at Seadrunar by engaging in an intimate relationship with another participant. As a result, the reunification plan fell through. T.W. claimed that she was discriminated against and that they didn't place her children with her, so she left Seadrunar.

After T.W. left Seadrunar, social worker Rachael O'Riordan referred T.W. to Navos for substance abuse and mental health treatment. At Navos, T.W. had a positive UA, which increased the intensity of treatment. T.W. tested positive for methamphetamine, cocaine, and cannabis. From April to August 2021, T.W. denied her drug testing results.

At the request of T.W.'s Office of Public Defense social work team, in April 2021, social worker Colleen Stark-Bell referred T.W. to chemical dependency provider Shundra King at For The Culture for substance abuse treatment. King started T.W. with outpatient treatment, but increased that to intensive outpatient treatment after receiving positive UA results. King found that T.W. had a disconnect when she began addressing

No. 83810-5-I/4

T.W. about her positive UAs.  But King finally convinced T.W. that inpatient treatment was necessary.  The termination trial had begun in October 2021, but it was paused to allow T.W. to enter inpatient treatment.  T.W. completed the inpatient program at Turning Point.

Substance use disorder counselor Joshua Sweet testified that although T.W. gained skills in inpatient treatment, she needed a year in outpatient treatment to succeed in recovery.  T.W. was set to resume intensive outpatient treatment with King after Turning Point, but she did not come back.  T.W. also did not participate in UA testing.  Because T.W. was not participating in intensive outpatient treatment, King could not give a complete prognosis for T.W.

Just as King started as T.W.'s substance abuse counselor, Trenecsia Wilson became her mental health counselor.  Wilson found that T.W. had an underlying issue of guardedness and minimizing that led her to have continuous issues.  After Wilson reached out to schedule more sessions, T.W. did not return.

T.W. had a strong bond of affection with her children.  The family had regular visits up to 12 hours each week.  However, as the dependency went on, emotions during the visits escalated because the children were still living in foster care despite T.W.'s claim that she was doing everything she needed for them to return to her.  The children showed both emotional and physical reactions to T.W.'s unfulfilled promises.  I.A.W. would lose control of her bladder.  M.L.W.'s confusion led her to believe that removal was her fault and that if she had been a "better kid," she could go home with T.W.  I.A.W. and M.L.W. were in therapy during the dependency.  Joan Freeman, I.A.W.

-4-

No. 83810-5-I/5

and M.L.W.'s guardian ad litem (GAL), testified that if the dependency were to continue for another year, it would decrease the children's sense of security and stability.

To help her understand I.A.W. and M.L.W.'s needs, and how she could meet them as a parent, social worker Stark-Bell referred T.W. to Lauren Brown, a therapist that provides in-home services. Brown oversaw T.W.'s completion of the Triple P parenting education service. Brown concluded that T.W. had basic parenting skills. But Brown remained concerned about the dynamic between T.W. and her children because T.W. continued to deny her substance use.

Brown recommended family therapy for T.W., I.A.W., and M.L.W. Stark-Bell did not, however, make the referral because, after consulting Christine Patuvak, I.A.W. and M.L.W.'s therapist, Stark-Bell determined that family therapy would not be appropriate for T.W. at that time because T.W. was still not admitting to substance use despite positive testing results.

B

The original termination filing involved all three children. But by the time of trial M.W. was 15 years old, and under RCW 26.33.160(1)(a) he had to agree to adoption.[2] On October 13, 2021, M.W.'s termination petition was dismissed after he did not agree to adoption.

On October 18, 2021, the Department and the court appointed special advocate (CASA) filed a joint pretrial motion requesting that M.W. not be allowed legal participation in the trial. In response, M.W. argued that he should be allowed to intervene to address the sibling relationship and the best interests of his sisters. The

---

[2] RCW 26.33.160(1)(a) requires the consent of the adoptee if they are 14 years of age or older.

No. 83810-5-I/6

Department and CASA argued that M.W. did not have a legal interest in his siblings' cases.

The trial court denied M.W.'s motion to intervene. The trial court found that M.W.'s intervention request was much like that of the older siblings in In re Dependency of J.D.P., 17 Wn. App. 2d 744, 487 P.3d 960 (2021). The trial court determined that, as in J.D.P., M.W.'s interests in ongoing contact with his siblings are considered in dependency and adoption proceedings, so they are not properly considered in the termination proceeding.

The trial court also denied permissive intervention. The trial court found that M.W. had not shown a common question of law or fact that would support permissive intervention. The termination trial went forward without M.W.'s participation.

The termination trial lasted 24 days between October 2021 and February 2022. Seventeen witnesses testified at the trial and over 200 exhibits were admitted into evidence. The trial court found that despite numerous services and programs offered to T.W., she had not progressed in her core parental deficiencies of substance abuse and mental health. The trial court also observed that T.W. was still in denial and not being honest with herself or the court when it came to her substance use and substance use disorder. Given this, the trial court did not believe that T.W. could successfully remedy her substance abuse in the near future for her children. The trial court also found that family therapy was not a necessary service because reunification was not imminent. On February 18, 2022, the trial court terminated T.W.'s parental rights to I.A.W. and M.L.W.

T.W. appeals.

No. 83810-5-I/7

II

An appellate court's role in reviewing a trial court's decision to terminate parental rights is to determine whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence. In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Evidence is substantial if, when viewed in the light most favorable to the prevailing party below—here, the Department—it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence. In re Dependency of M.P., 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994). Termination proceedings are highly fact-specific and, as such, deference to the trial court is particularly important. In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). We defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence and will not disturb those findings unless clear, cogent, and convincing evidence does not exist in the record. In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). We review whether the trial court's findings of fact support its conclusions of law de novo. K.M.M., 186 Wn.2d at 477.

A

T.W. argues that family therapy was a necessary service because the service would have helped the entire family understand the impact of T.W.'s substance abuse and communicate openly and honestly. We disagree.

RCW 13.34.180(1)(d) requires a petition seeking termination of a parent and child relationship to include a provision of ordered and necessary services. Family therapy was neither ordered nor necessary for T.W. Court-ordered services for T.W. included substance abuse treatment, mental health counseling, and parent education.

-7-

No. 83810-5-I/8

Family therapy was not included in ordered services and T.W. does not argue otherwise.

Family therapy was also not a "necessary" service as that term is used in RCW 13.34.180(1)(d) because necessary services are those which are "needed to address a condition that precludes reunification of the parent and child." K.M.M., 186 Wn.2d at 480 (internal quotation omitted). T.W. could have reunified with M.L.W. and I.A.W. if she could have achieved stability in sobriety and addressed her mental health issues. Because she did not, T.W. could not reunify with M.L.W. and I.A.W. and family therapy was largely irrelevant.

Family therapy was also not necessary for reunification because, according to Brown, T.W. did have basic parenting skills. The reason Brown suggested family therapy was to deepen the relationship between T.W. and her children and address the trauma caused by T.W.'s denial of issues despite the children not being returned home. But if she were sober and stable in her mental health, Brown testified that T.W. could meet the basic needs of her children for food, shelter, hygiene, and attention. Refinement of the parent-child relationship was to assist in making a transition successful, not to help make it happen. As the trial court noted, in-home services were ordered to begin when return home was "imminent," and at the time of termination, that was far off.

T.W. claims that social worker Stark-Bell's delay of family therapy was an abuse of power and in disregard of therapist Brown's recommendation. But the trial court weighed the testimony of many individuals, including Brown, in concluding family therapy was not a necessary service to achieve reunification. Brown called family

-8-

No. 83810-5-I/9

therapy a "make or break" service for a reunification that was not on the horizon at the time of termination. Every provider who worked with T.W., including Brown and T.W.'s substance abuse and mental health counselors, agreed that T.W.'s denial of issues and lack of sobriety impeded her functioning. When termination was ordered, T.W. was not in substance abuse treatment and was not providing UAs.

The trial court did not err in concluding that family therapy was not an ordered or necessary service under RCW 13.34.180(1)(d).

B

T.W. argues that termination of her parental rights was not necessary for I.A.W. and M.L.W.'s integration into a permanent home because the children were well adjusted in their long-term foster home while maintaining a strong and loving bond with T.W. We disagree.

RCW 13.34.180(1)(f) requires the Department to establish by clear, cogent, and convincing evidence that continuation of the parent-child relationship diminishes the children's prospects for early integration into a stable and permanent home. In re Dependency of A.M.F., 1 Wn.3d 407, 417, 526 P.3d 32 (2023). The Department can prove this element by establishing either that: (1) the parent-child relationship prevents the child from placement in an existing permanent home or (2) the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement. In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013). The Department proved, and the trial court found, that both alternative ways of demonstrating this element had been met.

No. 83810-5-I/10

T.W. claims that because the children were in a stable placement at the time of the termination, and could remain there without change while the dependency continues, RCW 13.34.180(1)(f) cannot be shown. T.W.'s claim has been rejected repeatedly. For example, in In re Dependency of A.D., 193 Wn. App. 445, 449-50, 376 P.3d 1140 (2016), the mother suffered from depression and her children were placed in foster care. The mother argued that because her children were already in a stable placement, maintaining her legal relationship to them had no impact. A.D., 193 Wn. App. at 457. While the trial court agreed with the mother, this court reversed concluding that RCW 13.34.180(1)(f) was satisfied where the Department demonstrated that, but for the legal relationship between the parent and children, there was a high probability that the children could find a permanent adoptive home. A.D., 193 Wn. App. at 458 (citing R.H. 176 Wn. App. 428; see also In re Dependency of A.C., 123 Wn. App. 244, 98 P.3d 89 (2004)); A.M.F., 1 Wn.3d at 418 (RCW 13.34.180(1)(f) satisfied where without the termination of parental rights, the child would not be eligible for adoption).

Substantial evidence supports the trial court's finding that M.L.W. and I.A.W. are together in a long-term placement that will be their adoptive home, and that adoption cannot be final without termination.

The Department also proved that the parent-child relationship has a damaging and destabilizing effect on the children that would negatively impact the children's integration into any permanent and stable placement. When a parent's interactions with a child make that child emotionally unstable so that they cannot integrate into another home, RCW 13.34.180(1)(f) is satisfied. In re Dependency of K.D.S., 176 Wn.2d 644, 702-03, 294 P.3d 695 (2013). I.A.W. and M.L.W. showed both emotional and physical

-10-

No. 83810-5-I/11

reactions to T.W.'s unfulfilled promises as the dependency continued. I.A.W. would lose control of her bladder and M.L.W.'s confusion led her to believe that removal was her fault. I.A.W. and M.L.W. were in therapy during the dependency, and the children's GAL testified that if the dependency were to continue for another year, it would decrease the children's sense of security and stability. Even though her children felt insecure and unstable, T.W. continued to deny her substance use and failed to participate in further treatments.

The trial court did not err in concluding that RCW 13.34.180(1)(f) was satisfied.

C

T.W. argues that she was entitled to have the court consider a guardianship under recent 2022 amendments to RCW 13.34.180(1)(f) requiring the court to consider whether a guardianship is available. We disagree.

Effective June 9, 2022, the legislature amended RCW 13.34.180(1)(f). Under the amended statute, when determining whether the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home, the court must consider "the efforts taken by the [D]epartment to support a guardianship and whether a guardianship is available as a permanent option for the child."[3]

Courts generally presume that statutes apply prospectively unless the legislature expresses a contrary intent. In re Marriage of Hawthorne, 91 Wn. App. 965, 967, 957 P.2d 1296 (1988). There is an exception for remedial statutes where retroactive application would further its remedial purpose. Hawthorne, 91 Wn. App. at 967-68. A

_____

[3] See In re Dependency of G.C.B., No. 84772-4-I, slip op. at 15 (Wash. Ct. App. Sept. 11, 2023).

-11-

No. 83810-5-I/12

statute is remedial and has retroactive application when it relates to practice, procedure, or remedies and does not affect a substantive or vested right. Hawthorne, 91 Wn. App. at 968.

The amendment to RCW 13.34.180(1)(f) was not effective until after the trial court terminated T.W.'s parental rights. As a result, there is nothing in the record before us to suggest that a guardianship was available or that a petition for guardianship had been filed. T.W. argues that the 2022 amendments to RCW 13.34.180(1)(f) are remedial in nature and thus apply retroactively because the appeal is pending. But it appears the 2022 revision of RCW 13.34.180(1)(f) is not remedial because it creates a new right of action in favor of T.W. by requiring the court to consider whether the Department affirmatively made efforts to "support a guardianship," and whether a guardianship is available as a permanent option before terminating her parental rights. Because the amended statute is not remedial, it does not apply retroactively.

III

A

T.W. argues that the trial court erred in denying M.W.'s motion to intervene as a matter of right. We disagree.

Civil Rule 24 governs motions to intervene in dependency and termination proceedings. J.D.P., 17 Wn. App. 2d at 762. A party seeking intervention as a matter of right must establish that (1) the application for intervention was timely, (2) the applicant claims an interest which is the subject of the action, (3) the applicant is so situated that the disposition will impair or impede the applicant's ability to protect the interest, and (4) the applicant's interest is not adequately represented by existing parties

-12-

No. 83810-5-I/13

to the litigation. J.D.P., 17 Wn. App. 2d at 762. Denial of a motion to intervene as a matter of right is reviewed for error of law. J.D.P., 17 Wn. App. 2d at 762. The parties do not dispute that M.W. timely moved for intervention. Thus, we address the three remaining factors in turn.

First, M.W. cannot claim an interest which is the subject of the action because siblings do not have a right to be involved in a termination proceeding of a parent and another sibling. This court determined in J.D.P. that siblings of a dependent child, although they may have strong feelings about their contacts with that child, have no legal interest beyond what is found in dependency statutes for limited contact facilitation by the Department. 17 Wn. App. 2d at 762. We held that siblings do not have a legal right to intervene at termination:

> While certainly the older siblings may have a natural interest in the fate of their younger siblings, as discussed above, the [Juvenile Court's Act ch. 13.34 RCW] focuses on the interests of siblings in dependency and placement proceedings, not in termination proceedings. There is already a forum for the older dependent siblings to address their relationships with the younger siblings: their own dependency proceedings. A dependent child's contact with siblings is addressed in the statutes describing dependency procedures, not termination procedures.

J.D.P., 17 Wn. App. 2d at 762.

This case is factually consistent with J.D.P. because M.W. is in the same position as that of the older siblings in J.D.P. In J.D.P., the mother had four children. 17 Wn. App. 2d at 749. Because of the mother's substance use disorder, the Department filed for termination of parental rights to the younger siblings while they were placed in foster care. J.D.P., 17 Wn. App. 2d at 751-52. The older siblings moved to intervene in the termination proceeding of their younger siblings. J.D.P., 17 Wn. App. 2d at 752. But as explained above, the court denied intervention as a matter of right because "a

-13-

No. 83810-5-I/14

dependent child's contact with siblings is addressed in the statutes describing dependency procedures, not termination procedures." J.D.P., 17 Wn. App. 2d at 762.

Like the mother in J.D.P., T.W. had three children. Because of T.W.'s substance use disorder, the Department placed I.A.W. and M.L.W. in foster care and filed for termination of parental rights. M.W. was the oldest sibling and he sought to intervene in the termination proceeding. Thus, like the holding in J.D.P., M.W. did not have a legal interest beyond what is found in dependency statutes.

Even if M.W. had a right to intervene in his sisters' termination proceeding, it is not T.W.'s right to argue. M.W. could have appealed the trial court's order denying his intervention and prohibiting his legal participation in his sisters' termination proceeding. See, e.g., Westerman v. Cary, 125 Wn.2d 277, 280, 892 P.2d 1067 (1994) (a prosecutor appeals the superior court's denial of his motion to intervene). T.W. lacks standing to argue M.W.'s alleged constitutional right.

Second, the disposition will not impair or impede M.W.'s ability to protect his interest because he had other avenues to participate in the termination trial if he wished to. Even though the trial court denied M.W.'s motion to intervene as a matter of right, the Department and CASA's joint motion suggested that M.W. could participate in the termination trial by providing testimony or a declaration. M.W. chose not to do so.

Further, while T.W. claims that M.W. and his sisters' legal relationship is not protected absent a separate legal agreement, the evidence showed that M.W. was having liberal visits with his sisters at his discretion. Stark-Bell testified that I.A.W. and M.L.W.'s foster parents even offered to be the caregivers to M.W. to facilitate his bond with his sisters, but M.W. preferred to remain where he was. Thus, while T.W.'s claim

-14-

No. 83810-5-I/15

that M.W.'s right to see his sisters cannot be forced upon his sisters' adoptive family absent a legal agreement is legally correct, as a factual matter, the adoptive family was supportive of M.W. maintaining his bond with his sisters.

Third, M.W.'s interest is adequately represented by existing parties to the litigation because all the parties involved in the termination proceeding are legally represented. M.W. was 15 years old and he did not agree to adoption; therefore, his termination petition was dismissed. Thus, only I.A.W. and M.L.W. were subject to the termination petition. I.A.W., M.L.W., and T.W. were legally represented. There was no interest not being represented.

The trial court did not err in denying M.W.'s motion to intervene as a matter of right.

B

T.W. argues that the trial court erred in denying M.W.'s permissive intervention because T.W. and M.W. shared an interest in maintaining a legally binding family relationship with I.A.W. and M.L.W. We disagree.

Under CR 24(b)(2), a trial court may grant permissive intervention where the applicant's claim and the main action have a question of law or fact in common. J.D.P., 17 Wn. App. 2d at 763. "The decision of a trial court to allow or deny permissive intervention in a dependency is within the court's informed discretion and will not be disturbed absent an abuse of discretion." J.D.P., 17 Wn. App. 2d at 763. A trial court abuses its discretion when no reasonable person would take the position taken by the trial court. J.D.P., 17 Wn. App. 2d at 763.

-15-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 83810-5-I/16

T.W. and M.W. did not have a shared interest in maintaining a family relationship with I.A.W. and M.L.W. As the Department correctly points out, T.W. was not a crucial connector between the siblings. So, the relationship between M.W. and his siblings was not relevant to whether termination was in the children's best interests.

The trial court did not err in denying permissive intervention.

C

T.W. argues in the alternative that M.W. has a constitutional right to family integrity that entitled M.W. to intervene. We disagree.

T.W. bases her constitutional argument on her claim that M.W. has a right to "family integrity" which she describes as applicable in sibling to sibling relationships. T.W. cites Santosky v. Kramer, 455 U.S. 745, 760, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), which held that termination matters should be decided based on clear, cogent, and convincing evidence. The quote T.W. relies on addresses the interest that: "[T]he child and his parents share . . . in preventing erroneous termination of their natural relationship." Santosky, 455 U.S. at 760. But the right expressed in Santosky is expressed in the singular—the right the child and his parents share. Santosky does not address a right between siblings or one sibling's right to have a say over another sibling's relationship with their parents.

T.W. also cites In re Dependency of MSR, 174 Wn.2d 1, 271 P.3d 234 (2012), in support of her claim that Washington recognizes a due process right to maintain the integrity of family relationships. MSR, however, examined what rights children have in a proceeding where their own legal relationship with their parent may be terminated in the context of whether counsel must be appointed for the child at termination. 174 Wn.2d at

-16-

No. 83810-5-I/17

15-20.  While T.W. is correct that the court noted a child's interest in "maintaining the integrity of family relationships, including the child's parents, siblings, and other familiar relationships," those interests arose because the children were directly involved in the termination proceeding—not because they were siblings of other children going through termination.  MSR, however, does not confer on one sibling a constitutional interest in the parent-child relationship between another sibling and the shared parent.  174 Wn.2d at 15-20.

The trial court was not required to grant intervention to M.W. based on a constitutional right to family integrity.

We affirm.

_____
Mann, J.


WE CONCUR:


_____               _____
Birk, J.                                       Chung, J.